613 So.2d 1084 (1993)
Randall R. GUILLORY, Plaintiff-Appellee,
v.
TERRA INTERNATIONAL, INC., Defendant-Appellant.
No. 92-63.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1993.
Rehearing Denied March 22, 1993.
*1086 Blake Deshotels, Ville Platte, for plaintiff/appellee.
Pat F. Willis, Jr. and Robert Voitier, Jr., Opelousas, for defendant/appellant Terra.
C. Brent Coreil, Ville Platte, for defendant/appellee Guaranty Bank of Mamou.
Before YELVERTON, KNOLL and SAUNDERS, JJ.
SAUNDERS, Judge.
Terra International, Inc. (hereinafter "Terra") appeals the judgment granted in favor of Randall R. Guillory (hereinafter "Guillory") on the basis that Terra wrongfully seized certain funds in an account with Guaranty Bank of Mamou (hereinafter "Guaranty Bank"). We affirm.
Terra obtained judgment against Guillory for $15,591.89 on its suit on open account for the purchase of supplies provided by Terra to Guillory in 1988. Terra, as judgment creditor of Guillory, obtained a writ of fieri facias and served garnishment on the garnishee bank, Guaranty Bank, on May 16, 1990. Consequently, the bank froze two checking accounts and suspended Guillory's crop production loan for 1990.
However, on May 30, 1990, Terra authorized Guaranty Bank to release the proceeds obtained through the crop production loan. For months thereafter, the attorney for Guillory filed various rules and motions, all of which were met with exceptions and sustained by the trial court. Finally, on January 30, 1991, Guillory filed a petition for damages. In his petition, Guillory alleged:
4.
Between the time of May 14, 1990 and the day that defendants, Terra International, Inc. and Pat F. Willis, Jr., released *1087 the seizure of petitioner's credits, petitioner was in dire need of his financial resources to irrigate, fertilize, and plant his rice and soybean crops. Due to the lack of his ability to draw on his pre-approved crop loan, petitioner was unable to adequately flood his rice at a critical stage in the rice plant's growth. In addition, petitioner was unable to fertilize his crop at a critical stage in the growth of his rice. Last but not least, petitioner was delayed in planting his soybean crop which said delay on a day-by-day basis decreased petitioner's yield and also increased the severity of the drought due to the failure of the rainfall to occur subsequent to the release of the funds.
5.
The foregoing circumstances have caused petitioner a tremendous loss in his crop for the year of 1990. The loss was a direct result of petitioner being unable to utilize his pre-approved crop loan.
6.
Defendants, Terra International, Inc. and Pat F. Willis, Jr., are liable unto your petitioner for this wrongful seizure as they knew or should have known that crop loans for the year of 1990 could not be used to pay or extinguish any debt which arose as a result of a previous year's crop production. Even after acquiring said knowledge from counsel for Randall R. Guillory and the garnishee, Guaranty Bank of Mamou, they persisted in withholding their permission to allow petitioner to draw on his pre-approved crop loan.
7.
As a result, petitioner's financial condition has severely deteriorated. The mental anguish and worry which petitioner has endured during this past year watching his farming operation going down the tubes because of this wrongful seizure has caused and will cause serious permanent mental trauma and suffering. Petitioner is entitled to be compensated for such mental worry and trauma as a result of this wrongful seizure. Petitioner at the time of the filing of this petition has been denied the approval of his crop loan from his customary lender, Guaranty Bank of Mamou. The worry and mental anguish in attempting to find another lender willing to take the chance on petitioner has also caused your petitioner much mental anguish.
In that suit, he names not only Terra but also Pat F. Willis, Jr., counsel for Terra, as a defendant. The suit ends with a default judgment taken against Terra alone. Subsequently, on June 18, 1991, Terra successfully had that judgment annulled.
Terra and Willis answered the initial petition and brought a third party demand against Guaranty Bank. In its answer, Terra asserted the affirmative defense of set-off of the $15,591.89 judgment it had against Guillory.
Guaranty Bank filed a motion for summary judgment and an exception of no cause of action. After hearings, the trial court granted the motion for summary judgment and dismissed Guaranty Bank.
The matter went to trial on November 27, 1991. The trial court rendered judgment in favor of Guillory and against Terra in the amount of $49,360.00, plus legal interest and attorney's fees, subject to a set-off of $15,591.89, plus accrued interest and late charges. The trial court further dismissed Pat F. Willis, Jr. from the suit and finally, assessed all costs against Terra. Terra appeals, contending:
1. The trial court erred in ruling that there was a wrongful seizure.
2. The trial court erred in ruling that any action by Terra was the cause of any damages suffered by Guillory.
3. The trial court erred in awarding Guillory any damages and/or in setting the amount of the damage based upon Guillory's failure to carry his burden of proof.
4. The trial court erred in failing to give Terra a credit for the amount received *1088 by Guillory from the Crop Insurer.
5. The trial court erred in granting the Bank's Motion for Summary Judgment and Exception of No Cause of Action.
Guaranty Bank answered the appeal seeking attorney's fees and penalties against Terra and Pat F. Willis, Jr., which were denied by the trial court in its judgment granting the motion for summary judgment.
Guillory did not submit a brief to this court, nor did he answer the appeal, therefore, the judgment is final as to the set-off.

DISCUSSION
The account in question was a $105,717.00 line of credit extended by Guaranty Bank, secured by a crop pledge. This initial loan was an FHA guaranteed crop loan. The loan proceeds were disbursed and placed into an account with Guaranty Bank entitled account number HHH. Advances were made to Guillory to facilitate his crop production for the present year. Each advance was in the form of a promissory note secured by the mortgage executed for the crop loan. The advances were earmarked for the particular purpose of growing the present year's crops. Each advance was subject to certain contractual conditions between Guillory and Guaranty Bank.
In J.L. Cargill v. B.C. Otwell, 3 La.App. 197 (2d Cir.1925), a nearly identical factual case, involving the same issue, the court determined the loan proceeds from a crop pledge were not subject to garnishment proceedings. Otwell, the debtor, had money on deposit with the garnishee bank that had been loaned to him by the garnishee to enable him to plant, cultivate, and gather agricultural products, on which the bank would have a privilege for the loan. The court held that the money on deposit constituted a trust fund that could not be diverted from the purpose to which it was dedicated by seizure at the instance of a third person, and that the judgment debtor's interest in it could not be subject to garnishment. We endorse that holding and reproduce the pertinent parts of the opinion as follows:
"The legal questions involved in this contest are res nova in Louisiana law and jurisprudence, so far as this court has been able to ascertain; hence the court is compelled to rely almost wholly upon the law of other jurisdictions, and precedents of other jurisdictions in point appear to be none too numerous. There are, however, certain principles of law bearing upon allied questions in our own jurisdiction that appear to be fundamental. For example: While the lender of money upon a crop pledge to enable the borrower to make a crop is not expected or required to follow up the disbursement of the money so loaned and see to it that the money is used solely for the purpose it was loaned, probably, it is nevertheless true that if he knowingly permits the money to be used for a purpose other than and foreign to the purpose of planting, growing and harvesting of a crop, he loses his privilege upon the crop. And it is also true that the merchant selling the planter necessary plantation supplies to enable him to make a crop has a privilege on the crop to secure the payment of his account, for such articles as constitute necessary supplies for the making of the crop; but for such articles sold as do not constitute necessary supplies for that purpose the seller has no privilege whatever. And in neither of these cases does the privilege extend beyond the crops of the year the supplies were furnished, or the money loaned, as the case may be. And in the case of a crop pledge it was held by the court in the case of National Bank of Commerce vs. Sullivan, 117 La. 163, that a person advancing money to be used in the making of a crop must prove that it was so used in order to preserve his pledge, where the privilege is contested.
"Hence, in the case of a money lender, such as a bank, letting out money on crop pledges and placing the money so loaned to the credit of the borrower on the books of the bank subject to the checking rights of the borrower, it is of the most vital importance to the lender *1089 that he safeguard his interests by an agreement with the borrower by which the lender may control and supervise the disbursement and expenditure of the money loaned to the end that it may not be diverted from the purpose it was loaned for. This precaution is necessary as protection not only against the faithless or extravagant borrower but also as against creditors of the borrower. And it would be indeed an unwise, improvident, and unjust legal system that would withhold its sanction from a business policy so sound and so imperatively necessary for the protection of those who are able to help and willing to help the needy and unfortunate, if in doing so that may not legally covenant for their safety and protection. Does the law of Louisiana deny to parties able to contract and capable of contracting the right of contracting in this way? I do not think it does. Such form of contracting is certainly not contra bonos mores; nor is it in contravention of any prohibitory law that the court knows of.
"Then what do we find the situation in this case to be? Considered according to the sworn statement of D.M. Atkins, president of Ruston State Bank, who personally made the contract with B.C. Otwell which is involved in this contest, the court finds that the bank loaned Otwell four hundred dollars to furnish him with the necessary supplies and means to make a crop this year: that the said loan was secured by a collateral note for six hundred dollars, which collateral note was secured by a crop pledge upon the crop to be grown by the debtor this year; all of which transactions were and are in writing and are before the court. That before making the loan the bank required of Otwell that he consent for the bank to supervise the expenditure of the money so loaned to the extent and for the purpose of seeing that it was used only for the purpose it was loaned, viz: for the buying of provisions and supplies and other things necessarily required in making a crop this year, and for that purpose and to that end that the bank should have possession and control of the funds, notwithstanding they were placed to the credit of the borrower on the books of the bank. This arrangement constitutes a form of trusteeship, which confers upon the bank the dual relation of both debtor and fiduciary to the borrower; and the existence of this fiduciary capacity in the holding of the funds and directing their disbursement imposes a limitation upon the rights of Otwell's creditors. If the funds borrowed had been placed to the credit of Otwell on the books of the bank subject to his unrestricted right to check upon the same, then, and in that event the funds would have undoubtedly been subject to garnishment by his creditors; but not so under the condition of things, agreement and contract sworn to by the president of the Ruston State Bank.
"If by the agreement and understanding between Otwell and the bank the former had limited and restricted the rights and uses he might make use of said funds, an attaching creditor could certainly exercise no greater right. Hence, if Otwell would have no right to draw out the funds and use them in paying Cargill's judgment, because of the restrictions placed upon his use of the funds by the bank on making him the loan as the condition on which the loan was made, much less would Cargill as a creditor of Otwell have the right by seizure of said funds to apply them to his judgment and divert them from the use for which they were loaned. This is a simple, self-evident legal axiom that cannot be refuted. There is no fraud against the debtor's creditors, and no unfairness, in an agreement of this kind. Indeed, for the bank not to have had some such agreement and understanding, would have been, on the bank's part, the grossest of short-sighted policy, as only in some such way could it have protected the security it demanded and received from the borrower and the loan it had made upon that security; and the action of the bank in demanding this right, and of Otwell in granting it, is to be commended rather than criticized. It was the principal, if not only, saving *1090 clause in the transaction, insofar as the bank is concerned; and as it concerned Otwell it was the only thing that made sure his means of making a crop this year and supporting his family. The principle of law announced above as axiomatic appears to be fundamental to the effect that a seizing creditor cannot acquire any greater right in the property of his debtor than the debtor himself has, as announced in Ruling Case Law, 12 vol. p. 778. And extending this principle a little further we find under the law on attachments that the relations previously established between the garnishee and a common debtor cannot be upset or interfered with by garnishment proceedings at the instance of a prior creditor."
Therefore, in accordance with the above, Terra's garnishment of the line of credit was wrongful and Guillory is entitled to judgment against Terra.

DAMAGES
Terra objects to the award of damages, contending the damages were excessive and not supported by the evidence.
Before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making that award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). In reviewing an award of damages to determine whether it is inadequate or excessive, the appellate court must look at the individual circumstances of the particular case. Only after a close analysis, if the facts reveal a clear abuse of discretion by the trier of fact, may the award of damages be altered. See Simmons v. Calcasieu Community Center Playground, District # 2, 524 So.2d 775 (La.App. 3d Cir.1988).
It is a well settled principle that only actual damages are allowable and these must be established with reasonable certainty. Our Supreme Court has held "actual damages cannot be established by remote and conjectural estimates of loss." A.N. Goldberg, Inc. v. Delerno, 225 La. 568, 73 So.2d 464, 465 (1954). The law, however, is also well settled that when there is a legal right to recover damages, but the amount cannot be exactly estimated, the courts have reasonable discretion to assess damages based upon all of the facts and circumstances of the particular case. A plaintiff's demand should not be rejected merely because he cannot establish, with precision, the amount of damages suffered. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Moore v. Thornwell Warehouse Ass'n., 524 So.2d 828 (La.App. 3d Cir.1988).
The loan proceeds were the only means Guillory had of making a crop that year. The restricted use of his funds, even for a period of fourteen (14) days, caused a great upset and near complete halt in Guillory's farming operation. Undisputed testimony indicated that this period was a crucial time in the planting stages of his soybean crop and in the flooding and fertilizing stages of his rice crop. Without the use of the necessary funding, Guillory was forced to forego planting of his bean crop until the middle of June and was delayed in fertilizing and flooding some of his rice fields.
Mr. Aubrey Mire, an agronomist for the LSU Agriculture Center, testified at trial as Guillory's expert witness. He was the only expert witness to testify. He was called to inspect several of Guillory's fields. According to the testimony of Mr. Mire, the aforementioned delay would cause a lower yield of both rice and beans per acre. Mr. Mire further testified as to the average yield of beans and rice for Evangeline Parish for the year 1990. Guillory then testified, uncontradicted, as to what his actual yields for both crops were once harvested.
The trial judge determined first a loss based upon comparing the actual yields to the parish averages. In both the rice and bean yields, Guillory's yield was substantially lower than the parish averages. The trial judge used the following formula in determining damages to the soybean crop:
1. The trial judge used the parish average and multiplied it by Guillory's acreage to determine a projected yield.

*1091 2. He then multiplied the acreage by the actual yield.
3. Next, he subtracted the actual yield in bushels from the projected yield.
4. He then multiplied the number of lost bushels by the price the crop was actually sold for to come up with monetary damages.
We find the formula appropriate under the circumstances of this case.
Our review of the record and the trial judge's reasons for judgment do not indicate how the trial judge arrived at the damage award on the rice crop. However, we see no reason why the formula set forth above cannot be applied to the rice crop as well.

Soybean Crop
The trial court awarded $33,360.00 for damages to Guillory's soybean crop. Of the 353 acres of soybean field, the trial court found that Guillory actually farmed approximately 278 acres of soybean. This acreage was not contiguous and was comprised of numerous tracts located in different parts of Evangeline Parish.
According to Mr. Mire, the optimum time for planting soybeans is May 1 through May 30. Any delay, especially after June 5, would cause a loss of one-half (½) bushel per acre, with losses progressing with the length of the delay. In light of the fact that there was a narrow window of opportunity for the planting of beans, the important consideration is that Guillory missed his opportunity to plant because he was unable to use his funds. Additionally, Guillory was further delayed in planting due to dry weather conditions and could not plant his bean crop until sometime after June 15. Thereafter, Evangeline Parish experienced heavy rainfall. This excessive rainfall affected the new bean sprouts and Guillory was forced to replant. He testified that had his beans been planted four (4) weeks earlier (during the period his funds were seized), his beans "would have been anywhere from six to about six to eight inches tall and they would have survived all this weather problems."
To determine whether Guillory suffered actual yield problems resulting from the delay, Mr. Mire testified as follows:
A. I think the only fair wayor maybe the fair ways to reach the conclusion here is if this man's yield did not come up to twenty-seven (27) bushels per acreif he made ten (10) bushels per acre then I think he didn't live up to the parish average and he needs to be compensated for his loss. If his average was twenty-seven (27)he cut twenty-seven (27) bushels per acre on that field I would say that nobody owes him anything.
BY THE COURT:
If he made up to twenty-seven (27) bushels.
A. Yes, sir.
Relying on Mr. Mire's position and the fact that Guillory's yield was only seven (7) bushels per acre, clearly indicating loss attributable to the delay, the trial judge made the award based upon the aforementioned formula.[1]
*1092 Terra objects to the trial court's use of the entire bean field acreage in the calculations. While it is true that Mr. Mire only inspected a portion of the acreage planted by Guillory, it is also true that none of the fields were planted during the critical period referred to by Mr. Mire, and so we find no error in using the entire acreage to calculate damages. We find that his formula takes into account the appropriate factors and the award is proper.

Rice Crop
The trial court awarded Guillory $6,000.00 for losses to his rice crop. According to the crop pledge, Guillory farmed the following acreage in rice[2]:

RICE: 136 acres on land of Wade Farms located 2 miles W. of Barber Spur bounded on the N. by V. Fontenot, S. by Hwy. 10, E. by Chesley Fontenot & W. by Jeanard Fontenot. 81 acres on land of St. Landry Sec. Savings located 2 miles W. of Barber Spur bounded N. by Bayou Nep., S. by Spears Est. E. by J.P. Smith Est. and West by D. Fontenot Est. 73 acres on land of Littell Young bounded on the S. by Littell Young, E. by J. Dupuis & W. by Lloyd Russell. 57 acres on land of Alvin Tate bounded N. by David Fontenot, E. by HURLEY Mose, W. by Mike Tate and S. by Brent Coreil.
Mr. Mire was called by Guillory to advise him on the best approach to save the crop in the field in the best possible manner. Depending on the conditions of the field and the stage of the rice, Mr. Mire made projections as to the losses Guillory could foresee in his yields.
He first inspected the 136 acre Wade Farm field in which close inspection of the rice stalk indicated the rice was at the tillering stage. Guillory had previously applied the herbicide, Propinal, to the entire field. According to Mr. Mire, water should be used after the application of Propinal to irrigate the crop within a twenty-four (24) hour period. At the time Mr. Mire inspected the field, only 66 acres had not been flooded. Additionally, the entire 136 acre field had not yet been fertilized at the date of his inspection. It was his testimony that Guillory's failure to flood the 66 acres and failure to fertilize the entire field, would result in a loss of approximately three barrels per acre.
Mr. Mire also inspected the 73 acre Littell Farm field. His inspection of the rice stalk in that field indicated the rice was between the tillering and first green ring stage. This field was flooded, however, the field had not yet been fertilized. Mr. Mire testified that losses resulting from failure to apply fertilizer to this field, would be an average of three barrels per acre. However, Guillory testified he did not suffer any losses on this field. According to Guillory, expenses on the two fields were shared by other parties which allowed him the opportunity to continue operations. Therefore, this acreage should not be included in the assessment of damages.
Terra correctly objects to the testimony at trial regarding Mr. Mire's inspection of the Tate Farm field. Mr. Mire could not testify as to any losses on the field because he did not inspect the rice stalk to determine its stage of development. Guillory has not proven a loss on this field, and this acreage should not be considered in awarding damages.
Mr. Mire testified the average rice yield that year for the parish was 35 barrels per acre. In the Wade Farm field, Guillory's yield was 21.98 barrels per acre. Therefore, the trial court properly determined a loss attributable to the improper seizure of funds. Using the trial court's formula in determining the damages, the damage amount would be $15,051.12. Therefore, the award of $6,000.00 was not excessive.
*1093 As to the inadequacy of damages resulting from our calculation, as Guillory did not answer the appeal requesting a modification of his award, the $6,000.00 award is final. See LSA-C.C.P. art. 2133.

Mental Anguish
In addition to the above damages, the trial court awarded Guillory $10,000.00 for his mental anguish, mental trauma, and frustration. Under our jurisprudence, a party aggrieved by a wrongful seizure is entitled to recover not only the special damages caused him, but also the general damages for mortification, humiliation, and mental worry caused by the intentional violation of his property rights. Moses v. American Security Bank of Ville Platte, 222 So.2d 899 (La.App.3d Cir.1969); John Deere Co. v. Eames, 556 So.2d 959 (La.App.3d Cir.1990).
The trial judge noted in his reasons for judgment the despair of Guillory when faced with the inability to continue his farming at the critical stages in his crop production. He was obviously struck by Guillory's own testimony as well as the testimony from Francine Deville. Francine Deville was living with Guillory at the time and testified as to Guillory's aggravation, inability to concentrate, and general worry about obtaining money to continue supporting himself, in addition to the worry about his farming operation. There is no question that Guillory was mortified at the prospect of losing his entire crop. It is our conclusion that the trial judge did not abuse his discretion.

COLLATERAL SOURCE CLAIM
Terra contends it is entitled to a credit for the amount Guillory received from his crop insurer. The trial court refused to give Terra the credit citing the collateral source rule. However, in this case, Guillory, upon receipt of his benefits of $20,001.00, subrogated his right of recovery to the insurance company, as per a subrogation provision included in the insurance contract. When the insurer paid the loss on Guillory's crop, it became subrogated to the extent of this payment to Guillory's claim against Terra. At this point, Terra remained liable to Guillory for the unpaid portion of the damages and the insurer could proceed under its subrogation rights for reimbursement of its payment. See LSA-C.C. arts. 1825 to 1830.
This right of subrogation, as Terra asserts, is an exception to the collateral source rule. The procedural law of subrogation is set forth in the Code of Civil Procedure art. 697.
The fact that the crop insurer did not appear as a party plaintiff to assert its subrogation rights and the defendants did not timely object to the nonjoinder of the necessary party, does not prevent the court from making an adjudication. When, as here, subrogation is in fact proven, the plaintiff, Guillory, may recover only his remaining interest in the partially subrogated claim. See Smith v. English, 586 So.2d 583 (La.App.2d Cir.), writ denied 590 So.2d 80 (La.1991); Southern Farm Bureau Cas. Ins. Co. v. Sonnier, 406 So.2d 178 (La.1981); LSA-C.C.P. art. 642; LSA-C.C.P. art. 697, Official Revision Comment (c).
Therefore the trial court erred in awarding Guillory the amount paid by the crop insurer; the judgment will be amended and reduced by the $20,001.00 paid to Guillory by his crop insurer.

GUARANTY BANK'S ANSWER TO THE APPEAL
Guaranty Bank has answered the appeal requesting that its cross-claim against Terra and Pat F. Willis, Jr. be maintained. In the cross-claim, Guaranty Bank alleged that the third party demand against it constituted ill practices in an attempt to escape liability to Guillory for its own wrongdoings. Pursuant to LSA-C.C.P. article 863, Guaranty Bank claims it is entitled to attorney's fees associated with the litigation in this appeal due to the third party demand's lack of foundation and support under Louisiana law.
Considering the nature of this lawsuit, we find sufficient reasonable, factual and legal reasons to sue Guaranty *1094 Bank for its own potential liability. There is no breach of article 863 if, after reasonable legal research and adequate factual investigation, a party and counsel in good faith decide to challenge existing law. Responsible, albeit, adventuresome lawyers must not be sanctioned in those circumstances, especially when they advise the court of existing law in their considered decision to seek its modification or reversal. Loyola v. A Touch of Class Transportation Service, Inc., 580 So.2d 506 (La. App. 4th Cir.1991).
Furthermore, Guaranty Bank made no motion to strike or for sanctions at the trial court level. As such, there is no evidence in the record to support Guaranty Bank's allegation that Terra's motives were improper. Accordingly, we deny this relief.
For the foregoing reasons, we affirm the judgment of the trial court, as amended. Costs of this appeal are cast against defendant, Terra International, Inc.
AFFIRMED AS AMENDED.
NOTES
[1] For convenience and clarity we excerpt this calculation from the trial court's reasons for judgment:

"Now, the Court findsand let me get this straightthe Court finds on the soybeans that he had planted two hundred and seventy-eight (278) acres. All right. Now, if we use the twenty-seven (27) bushel acre figure this would come to seven thousand five hundred and six bushels (7,506). All right. The testimony is also uncontradicted that this man made seven (7) bushes to the acre. All right. The two hundred seventy-eight (278) times seven (7) bushels is one thousand nine hundred and forty-six bushels (1,946). The Court subtracts one thousand nine hundred and forty-six bushels (1,946) from seven thousand five hundred and six (7,506) bushels and finds a loss of five thousand five hundred and sixty bushels (5,560). That is based upon the uncontradicted testimony of Mr. Aubrey Mire, and no testimony presented in Court to show that Mr. Guillory's farming practices were not satisfactory.
"On the contrary, the evidence shows that they were satisfactory because he testified that he has been farming since he was a child.
"So, that is what I'm going to find as a fact, that the plaintiff has proven a loss of five thousand five hundred sixty (5,560) bushels. The uncontradicted testimony shows that he sold it at six dollars and seven cents ($6.07) a bushel. I'm going to use six dollars ($6.00). I'm not going to consider that seven cents (.07). That's thirty-three thousand three hundred and sixty dollars ($33,360) soybean loss. So, you have gained, Mr. Guillory. Originally I had awarded you twenty-five thousand ($25,000.00). Today I am awarding you thirty-three thousand three hundred and sixty (33,360)."
[2] The testimony found in both the deposition of Guillory and at trial is very confusing about which fields contained what acreage. Therefore, we follow the acreage set forth by this document made part of Guillory's collateral mortgage.