759 So.2d 321 (2000)
James R. WINNON, Plaintiff-Appellant,
v.
Elmer DAVIS, Defendant-Appellee.
No. 32,988-CA.
Court of Appeal of Louisiana, Second Circuit.
May 15, 2000.
Theus, Grisham, Davis & Leigh by George M. Snellings, IV, Monroe, Counsel for Appellant.
Shotwell, Brown & Sperry by George Wear, Jr., Monroe, Counsel for Appellee.
Before STEWART, PEATROSS and DREW, JJ.
DREW, J.
James Winnon appeals a judgment denying his claim for injunctive relief and damages after Elmer Davis began diverting natural gas from Winnon's well on Davis's property for use in Davis's residence.
We reverse in part and remand.

*322 FACTS

On September 12, 1972, Paul Brooks granted a mineral lease ("Brooks lease") to Sterling Gas Company covering the Southeast Quarter (SE¼) and East Half of Southwest Quarter (E½ of SW¼) of Section 2, Township 19 North, Range 5 East in Ouachita Parish ("Brooks tract"). The Brooks tract is in an area known as the Monroe Gas Rock Field. The Brooks lease deleted a pre-printed clause and substituted a clause regulating the use of residential gas from natural gas wells on the Brooks tract:
Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land hereunder or from land pooled therewith for domestic use in the principal dwelling thereon.
The wells drilled under this lease are referred to as the Brooks wells.
On November 16, 1972, Elmer Davis granted a mineral lease ("Davis lease") to Sterling Gas Company covering the Southeast Quarter of Northwest Quarter (SE¼ of NW¼) of Section 2, Township 19 North, Range 5 East in Ouachita Parish. The Davis lease also contained a clause relating to the use of residence gas:
Lessor shall have the privilege at his risk and expense of using free gas from any gas well on said land for domestic use in the principal dwellings thereon.
This free gas clause is particularly different from the free gas clause in the Brooks lease because it does not mention "pooling." The wells drilled under this lease are referred to as the Davis wells.
Davis and International Paper eventually acquired the surface and mineral interests in the Brooks tract as owners in indivision. On June 23, 1994, Davis and International Paper executed an Act of Partition in which Davis received ownership of a 30-acre tract ("former Brooks tract") in the East Half of Southwest Quarter of Section 2, Township 19 North, Range 5 East. The Brooks well 2 ("BW-2") at the center of controversy in this case is located on the former Brooks tract. Davis's principal dwelling is not on the former Brooks tract, but is on part of Davis's land that is contiguous to the former Brooks tract.
Winnon was assigned the lessee's interest in the Brooks and Davis leases in 1985. Winnon has a 27/32 working interest in the Brooks wells. The lessors have a 5/32 royalty interest in the Brooks wells.
For several years, Davis diverted gas for his residence from a Davis well, pursuant to the terms of the Davis lease. When Davis could no longer get residence gas from this well, Davis, without informing Winnon, tapped into BW-2. The well closest to that formerly used Davis well is BW-2.
Winnon first learned that Davis was diverting gas from BW-2 in late September or October of 1995 when he read the production charts and noticed that production from the well was down. Winnon testified that upon reaching BW-2 and seeing that the well was shut-in, he opened the well back up to resume production. Winnon further testified that Davis responded by shutting off production from the well again. Winnon reacted by calling the Ouachita Parish Sheriff's Office. When Winnon, accompanied by a sheriff's deputy, returned to the well, Davis appeared and threatened Winnon in front of the deputy. The deputy allowed Davis to continue to divert gas for his residence. In October 1996, Winnon returned to the well, at which time he cut off Davis's line, opened the well back up and welded solid caps on the tubing and casing to prevent Davis from tapping into the well again. The next day, he received notice that Davis had called the sheriff's office.
On March 26, 1997, Winnon filed suit against Davis. Winnon sought preliminary and permanent injunctions enjoining Davis from shutting-in BW-2 and using gas from the well for his and his family's personal consumption, as well as past and future lost royalties and other damages resulting from the unauthorized use of the gas. *323 Winnon also sought an injunction prohibiting Davis from threatening or harassing him and from coming near his residence, place of business or wells.
Davis filed an answer and a reconventional demand, seeking a permanent injunction enjoining Winnon from disrupting the flow of natural gas to his house. Davis also sought damages for the prior disruptions of natural gas to his house, unreasonable damage to Davis's fence and hayfield and breach of an agreement to pay one-half the cost of a culvert.
Trial was held in this matter on April, 30, 1998. Written reasons for judgment were issued on August 21, 1998. The trial court noted that the area of the Brooks tract purchased by Davis is contiguous to land he already owned, thus forming, in the court's opinion, one estate. The trial court found that "the terms of the Davis lease and, more particularly, the Brooks lease, entitles Mr. Davis to receive residence gas[.]" The trial court ruled that an injunction prohibiting Davis from harassing or threatening Winnon was unnecessary since the court's determination that Davis was entitled to the gas should end any confrontations over the issue. The trial court concluded that Davis is entitled to a permanent injunction prohibiting Winnon from interfering with his right to receive residence gas from BW-2.
Judgment denying Winnon's claim for injunctive relief and damages and Davis's reconventional demand for damages was rendered on February 3, 1999.

DISCUSSION

Right to Free Gas
Winnon first argues on appeal that the trial court erred as a matter of law in ruling that Davis is entitled to take free gas from BW-2 for his dwelling. We agree.
A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. La. R.S. 31:114. Regarding the interpretation of mineral leases, our supreme court has stated:
In the absence of a violation of law or public policy, the mineral lease constitutes the law between the parties and regulates their respective rights and obligations. Frey v. Amoco Production Co., 603 So.2d 166, 172 (La.1992). See also La. R.S. 31:3. Mineral leases are construed as leases generally, and the provisions of the Civil Code applicable to ordinary leases, when pertinent, are applied to mineral leases. Frey, 603 So.2d at 171. Therefore, when the words of a mineral lease are clear and explicit and do not lead to absurd consequences, a court may not make further interpretation in search of the parties' intent. See La. C.C. art.2046.

Caskey v. Kelly Oil Co., 98-1193 (La.6/29/99),737 So.2d 1257.
The free residence gas clause in the Brooks lease at issue in this matter states:
Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land hereunder or from land pooled therewith for domestic use in the principal dwelling thereon.
The clear and explicit meaning of this clause is that "principal dwelling thereon" refers only to a dwelling on the land subject to the Brooks lease. It does not refer to a dwelling on land pooled with land subject to the Brooks lease. Because Davis's principal dwelling is not on any part of the Brooks tract, and hence not subject to the Brooks lease, he is not entitled to take gas for his residential dwelling from BW-2 under the terms of the Brooks lease.
The trial court found that "the terms of the Davis lease and, more particularly, the Brooks Lease, entitles Mr. Davis to receive residence gas[.]" The trial court erred in looking to the Davis lease in order to determine whether Davis is entitled to free gas under the circumstances of this case pursuant to the Brooks lease. The terms of the Davis lease are irrelevant to the determination of whether Davis could *324 take gas for his principal dwelling under the Brooks lease.
Davis argues that his original tract of land was pooled with the portion of the Brooks tract that he eventually acquired. This portion of the Brooks tract is contiguous to the Davis tract. Contending that the term "pooled" is not limited to the field of oil and gas, Davis cites cases using the term "pooled" in reference to real estate mortgages, shares of corporate stock, pension funds and blood plasma. Nonetheless, this is all irrelevant, as we are dealing with the term "pooled" in the context of an oil and gas lease.
Even if the language "principal dwelling thereon" in the Brooks lease is interpreted to include a dwelling on land pooled with the Brooks tract, the Davis tract and the portion of the Brooks tract acquired by Davis were not "pooled" as that term is contemplated in the lease.
Pooling is generally defined as:
A term frequently used interchangeably with Unitization (q.v.) but more properly used to denominate the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules, as distinguished from unitization, which term is used to describe the joint operation of all or some portion of a producing reservoir. Pooling is important in the prevention of drilling of unnecessary and uneconomic wells, which will result in physical and economic waste.
The term pooling is also used occasionally to describe cross-conveyances of mineral or royalty interests by separate owners or conveyances of such interests to a trustee for the purpose of sharing the income from production of wells drilled anywhere on the consolidated tract.
The former usage of the term relates to the working interest alone or to the working and non-operating interests; the latter usage typically relates to the non-operating interests only.
Citations omitted.
Patrick H. Martin and Bruce M. Kramer, 8 William & Meyers Oil and Gas Law 802-3 (Matthew Bender, 1999).
Davis's acquisition of adjacent land, although now creating one larger estate, did not result in the two tracts being "pooled" for purposes of this mineral lease.
Moreover, the Brooks lease provides to the lessee the right to pool the acreage royalty or mineral interest covered by the lease. Clause seven of that lease states, in part:
Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool, or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units ...
Our emphasis.
The Brooks lease does not expressly give the lessor the right to pool his interests with any other interests.
We additionally note that the Brooks lease states in clause ten:
The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee.
If we consider the Davis tract and the former Brooks tract as "pooled" solely by Davis's acquisition through the act of partition, which would thereby allow him to take residence gas for his principal dwelling not on the former Brooks tract, then Winnon's obligations as lessee would then *325 be enlarged by the change in ownership. This is clearly prohibited by the Brooks lease. We also note that a provision was specifically added to the Davis lease stating, "Paragraph 6 herein is deleted and any reference herein to pooling or unitizing of the acreage herein is null and void." Thus, the Davis lease apparently does not even permit the Davis tract to be voluntarily pooled.
We conclude that Davis did not have the right to take residence gas from a well on the Brooks tract for his principal dwelling not on the Brooks tract. The trial court erred in denying Winnon's permanent injunction.

Damages
The next issue is the amount of damages suffered by Winnon, who argues he is entitled to damages of $5,530.86. Davis argues that because both BW-1 and BW-2 share a common meter, Winnon did not establish his damages to a legal certainty.
It is a well-settled principle that only actual damages are allowable and these must be established with reasonable certainty, not by remote and conjectural estimates of loss. Barnco Intern., Inc. v. Arkla, Inc., 28,157 (La.App.2d Cir.11/15/96), 684 So.2d 986, writ denied, 97-0019 (La.2/7/97), 688 So.2d 511; Guillory v. Terra Intern., Inc., 613 So.2d 1084 (La.App. 3rd Cir.1993), writ denied, 619 So.2d 1063 (La.1993). The law, however, is also well settled that when there is a legal right to recover damages, but the amount cannot be established with precision, the courts have reasonable discretion to make an assessment based upon all of the facts and circumstances of the particular case. Barnco, supra; Guillory, supra. See also La. C.C. art.1999.
It is obvious from the reasons for judgment that the trial court believed that BW-2 had stopped production, and that the well needed to be modified in order for both Davis and Winnon to receive gas. The court stated:
The principle basis for the claim of damages asserted by Mr. Winnon is that the defendant Davis's use of gas from the Brooks 2 well to provide gas to his residence had the effect of shutting in the well, which means putting the well out of production. While Mr. Winnon, as an oil and gas operator, has considerable knowledge, there was no expert who testified that the use of residence gas from the Brooks 2 well necessarily would have the effect of shutting in that well. The testimony on this issue was in conflict, but the Court finds more credible the testimony from Mr. Davis that it is possible for him to receive residence gas from the Brooks 2 well, while Mr. Winnon could continue to secure gas from the well through appropriate adjustment at the well.

The Court gains comfort in the conclusion that it is possible for Mr. Davis to receive domestic or residence gas from a producing well without shutting it in from several sources. First, the evidence showed that Mr. Winnon and his mother received residence gas from a well he owns and he also gets production. Secondly, Mr. Winnon did not actually testify falsely on this issue. When his testimony is studied it seems clear that what he really said was that "as presently configured", he cannot get production from the Brooks 2 well, while Mr. Davis gets domestic gas. That's different than saying it is not possible to reconfigure the well to permit the taking of residence or domestic gas and still get production from the well.

Finally, Mr. Davis, a retired plumber testified that it is possible to install gauges and devices to permit the "cracking" of a valve to allow residence gas to be taken while leaving the well in production. That makes sense and the Court believes him.
The evidence shows that Mr. Davis, at his "risk and expense" did connect his gas lines to the Brooks 2 well, after the plaintiff failed to keep the Davis 1 well in production. He did this by attaching his line and a valve to the well which *326 could be cracked to permit residence gas to be taken, while well would remain for production. The evidence further shows that the plaintiff removed these fixtures from the gas well. Having done so, if the petitioner wishes to restore the well to use both for domestic production of gas and for production of gas for sale, the expense of doing so will rest upon him; his conduct was in violation of the right of the defendant, Mr. Davis, to residence gas.
Our emphasis.
Clearly the well was ultimately shut-in as a result of Davis's actions in taking gas from the well. Davis testified that at first he was able to get residential gas by cracking a valve while the well still produced, but that there was no way he and Winnon could both take gas after Winnon took the gauges off the well and welded all the valves. Winnon disputed the charge that he took any gauges off the well. However, Winnon testified that he welded the well in order to prevent Davis from diverting gas from it. Winnon explained that BW-2 is on a vacuum system, and that because of the way BW-2 is configured, it is impossible for both he and Davis to get gas from the well without additional equipment. Apparently when Davis again diverted gas from the well after Winnon welded the caps on it, the well became shut-in for production purposes.
There were five gas wells on the Brooks lease. BW-1 and BW-2 share a master meter, and the remaining three Brooks wells share a separate master meter. According to Winnon, before Davis began diverting gas from BW-2, that well averaged 122 MCF per day. This figure was reached by including the production from all five Brooks wells in the calculation.
Filed into evidence is a table showing monthly, from November 1995 through February 1998, how much Winnon allegedly lost in royalties, assuming BW-2 would have produced an average of 122 MCF per month. The total amount allegedly lost in royalties is $5,530.86. In calculating this amount, Winnon used monthly gas purchasing statements from Mid Louisiana Marketing Company to determine how much he would have been paid per MCF from November of 1995 through May of 1997. Winnon used gas purchasing statements from United American Gas Systems for June 1997 through February 1998.
Winnon introduced monthly R-5-P forms filed with the Louisiana Department of Conservation listing the production from various wells, including BW-1 and BW-2, which share a meter. These forms show reported production from BW-2 for several months before and after Davis began diverting gas from BW-2. The production figures were reached for BW-1 and BW-2 by dividing the production listed from their shared meter by two. Thus, production is still listed for BW-2 on the R-5-P forms even after Davis began diverting gas.
Davis filed into evidence production charts for BW-2 showing the production per month for an entire year, starting with 1993. These charts reflect one-half of what is measured each month at the master meter for BW-1 and BW-2. During 1993, the average for BW-2 was 86 MCF per month. In 1994, the average for B2 was 80 MCF per month. Winnon filed into evidence the 1992 production chart for BW-2, which shows an average production of 115 MCF per month for that year.
We find that it is necessary for this court to remand this case for a determination of damages to be awarded. First, the record does not reflect if production is even still available from BW-2 at this time, and if it is, at what levels. Jerry Thomason, who has been involved in the natural gas industry in the Monroe field for 43 years, testified that production from the field is slowly declining. Second, this court does not have before it evidence showing how much per MCF that Winnon would have received for gas from BW-2 from March of 1998 through the present.

Injunction against harassment
Winnon further argues on appeal that the trial court erred in denying his *327 petition for an injunction preventing Davis from harassing and threatening Winnon or coming near Winnon's residence, place of business or gas wells. Winnon testified that Davis has never hit him. He also testified that the only time Davis ever said anything hostile to him or in his presence was when a sheriff's deputy was present. Davis admitted he told Winnon that he was going to "kick his rear end" if Winnon ever came over his fence again. This incident took place nearly five years ago. There were no additional reports of confrontations. The injunction was properly denied.

CONCLUSION
We reverse that part of the judgment denying Winnon's claim for damages and for injunctive relief to enjoin Davis from using gas from the BW-2 well. We remand this matter to the trial court for an assessment of damages. The judgment is otherwise affirmed.

DECREE
At appellee's cost, the judgment is REVERSED IN PART, AFFIRMED IN PART and REMANDED for an assessment of damages.