684 So.2d 986 (1996)
BARNCO INTERNATIONAL, INC., et al., Plaintiffs-Appellants-Appellees,
v.
ARKLA, INC., et al., Defendants-Appellants-Appellees.
No. 28157-CA.
Court of Appeal of Louisiana, Second Circuit.
November 15, 1996.
Order Denying Rehearing but Granting Motion to Publish in Full December 5, 1996.
Writ Denied February 7, 1997.
*989 Weiner, Weiss, Madison & Howell by James Fleet Howell, Shreveport, for Plaintiffs-Appellants-Appellees.
*990 Blanchard, Walker, O'Quin & Roberts by James C. McMichael, Shreveport, for Defendants-Appellants-Appellees.
Before NORRIS, HIGHTOWER and STEWART, JJ.
HIGHTOWER, Judge.
After a ten-week trial in this breach-of-contract suit, a jury awarded Barnco International, Inc. the sum of $2,000,000 in damages against Arkla, Inc. and its subsidiary, Arkla Chemical Corporation. Each side now appeals. We reverse the judgment against the parent corporation, but affirm the final disposition in all other respects.[1]

FACTUAL BACKGROUND
James D. Barnes and Johnette Q. Barnes are the sole shareholders of Barnco International, Inc. ("Barnco"). On March 8, 1988, they obtained a patent on the "Oil Field Induction Generator System" after several years of development. The "In-Gen" device generates electricity from on-site natural gas or other similar combustibles. When utilized to power certain equipment, this technology potentially produces substantial savings over the usual cost of electricity. Barnco, through a licensing agreement with the Barneses, possesses the exclusive right to manufacture and sell these systems. Nevertheless, in late 1988 and early 1989, James Barnes ("Barnes") began seeking either an investor for the product or a large company to act as its distributor.
That search led Barnes to call upon certain friends in upper management at Arkla, Inc. ("Arkla"). When officials there concluded that an equity investment in Barnco did not fit their current business program, they examined other options in an effort to assist Barnes. As a result, Arkla Chemical Corporation ("AC"), a subsidiary of Arkla, entered into an exclusive ten-year distributorship agreement with Barnco on January 23, 1990. Under that contract, AC promised to market and sell In-Gens diligently and in good faith, in exchange for an equal share of all profits derived from the sales.
Initially, AC assigned five of its existing employees to the In-Gen effort. Shortly thereafter, the company hired Mike Kemp as a sales manager with duties limited to In-Gen marketing and sales. Additionally, AC contracted with another company to act as a subdistributor, and also engaged the services of several independent sales representatives. Even so, after sixteen months, not a single In-Gen had been sold.
Frustrated with the lack of success and sensing a personality conflict with AC's vice-president, Barnes began complaining to officials at various levels within the Arkla corporate structure. When negotiations to reform the contract failed to progress as anticipated and when the distributor failed to render timely payment on three units,[2] Barnco informed AC, in a letter dated May 31, 1991, that the contract had been automatically terminated as per Paragraph 11.01.[3] Barnco also reserved its right to recover damages caused by AC's inadequate performance under the agreement.
Consequently, on July 19, 1991, Barnco and its two shareholders filed suit against both Arkla and AC for breach of contract. After a greatly protracted trial, the jury rejected the individual claims of the Barneses,[4] but found the two corporate defendants indebted to Barnco for a total of $2,000,000. These appeals followed.

ARKLA'S AND AC'S APPEAL

Performance Under the Contract
In their primary assignment of error, defendants contend that the jury wrongly concluded that Arkla and AC "failed to perform *991 the obligation of the January 23, 1990, Distributorship Agreement by not promoting diligently and in good faith the sale and distribution of induction generator systems through the territory." Even so, in light of the manifest error standard, we are constrained to conclude this assignment of error lacks merit.

Obligors to the Contract
The jury deemed Arkla, Inc. to be an obligor under the January 1990 distributorship agreement. Defendants contend, and we agree, that this finding is not supported by the evidence.
As denoted by the document itself, the only parties to the contract are Barnco International, Inc. and Arkla Chemical Corporation. Parol evidence is not admissible to show prior or contemporaneous agreements varying the terms of a written contract. Fleming Irrigation, Inc. v. Pioneer Bank & Trust, 27,262 (La.App.2d Cir. 08/23/95), 661 So.2d 1035, writ denied, 95-2357 (La.12/08/95), 664 So.2d 427; Hill v. Cloud, 26,391 (La.App.2d Cir. 01/25/95), 648 So.2d 1383. Ordinarily, the meaning and intent of the parties to a written instrument should be determined within the four corners of the document, and its terms cannot be explained or contradicted by extrinsic evidence. Fleming, supra. Within the present contract, no other persons or entities are mentioned. Thus, under its provisions, nothing can be construed as obligating Arkla, Inc.
Even considering the various theories espoused by Barnco, we find manifest error in the jury's conclusion that Arkla obligated itself under the contract. In one contention, plaintiff argues that John Pronsky, former vice-president of Arkla, participated in the contract negotiations, and, thus, bound the parent company to the contract. Although, as a corporate planner, Pronsky initially examined the potential for a relationship between his company and Barnco, his position with Arkla terminated effective December 31, 1989, due to that entity's restructuring. His severance package provided that he would serve as a "consultant" pending his location of other employment, but all witnesses agreed he never functioned in that capacity. Pronsky himself also explained that the assistance he offered Barnes, after January 1, 1990, had been extended in the spirit of friendship rather than on a professional basis or as a representative of Arkla.
Nor do two certain business plans, projections of hoped-for sales during the initial five years, establish Arkla's intent to be bound under the agreement. Granted, the first plan, written by Pronsky shortly after the date of the contract, denoted that Barnco had recently entered into a "marketing partnership agreement with Arkla, Inc., a three billion dollar integrated gas company." According to its author, however, the composition had been prepared solely for Barnes to utilize in his attempts to secure additional credit from a bank. Moreover, a perusal plainly reveals the report to be a public relations/ promotional tool and not a contract binding Arkla. Harry Shobe, the AC vice-president who wrote the second plan, merely intended to provide officials at both his company and Arkla with an update of AC's current endeavors. Although this version substantially tracked Pronsky's writings, its summary specifically stated the agreement to be between Barnco and AC. It is unlikely that this document, prepared well prior to the litigation, would have incorrectly listed the obligors to the distributorship contract.
Finally, plaintiff points to two letters in which Barnes mentioned his contract to be with Arkla. At most, of course, this correspondence could demonstrate only his individual state of mind. And, as for a written dispatch by Shobe referring to Arkla rather than AC, the vice-president explained that a new secretary typed and signed the letter for him, and apparently made a mistake. He further observed that hundreds of other missives from his office correctly designated AC as the entity involved. So too, all such writings had been transcribed onto Arkla Chemical Corporation letterhead.
Considering the record, then, Arkla is clearly not an obligor under the contract.

Piercing the Corporate Veil
Defendants next contend that, in deciding Arkla disregarded its subsidiary's corporate *992 identity so extensively that AC ceased to be a separate and distinguishable corporation, the jury erred. Again, we agree. The presented evidence does not meet the demanding standard for piercing the corporate veil.
Corporations are distinct legal entities, separate from the individuals who comprise them, and the shareholders are generally not liable for the debts of the corporation. Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164 (La.1991); First Downtown Development v. Cimochowski, 613 So.2d 671 (La.App. 2d Cir.1993), writ denied, 615 So.2d 340 (La.1993). In a few limited situations, however, a litigant can reach a shareholder by "piercing the corporate veil," thereby rendering the individual liable for the corporation's debts or obligations. First Downtown, supra. Usually this occurs where the corporation is said to be simply the "alter ego" of the shareholder, that is, where the requisite corporate formalities have been disregarded to the extent that the corporation ceases to be distinguishable from its shareholders. Riggins, supra.
Indicia of such disregard include undercapitalization, commingling of corporate and shareholder funds, failing to follow statutory formalities for incorporating and transacting corporate affairs, failing to maintain separate bank accounts and bookkeeping records, and failing to hold regular shareholder and director meetings. Riggins, supra; First Downtown, supra; Central Business Forms, Inc. v. N-Sure Systems, Inc., 540 So.2d 1029 (La.App. 2d Cir.1989). Still, proving some of these factors may not result in individual liability if the totality of the circumstances negate the application of the alter ego concept. Central Business Forms, Inc., supra. Also, the courts have usually applied a more stringent standard where the party seeking to pierce the veil, in a contract case, voluntarily entered into an agreement with a corporate entity and knowingly accepted the consequences of limited liability. See generally the rehearing denial in Riggins, 592 So.2d 1282 (La.1992). See also Central Business Forms, supra.
Plaintiff's evidence falls dismally short of piercing the corporate veil. While AC's funds are managed by the parent company, exact records are maintained as cash moves from one entity to the other. Earnings reserved by Arkla on behalf of AC are shown in the subsidiary's books as an account receivable, and the smaller concern earns interest on such monies used by the parent organization. Nor can plaintiff correctly claim AC, reportedly with fourteen to fifteen million dollars in retained earnings, to be undercapitalized. As for corporate formalities, although AC's board of directors does not regularly meet in person, its affairs are permissibly conducted by consensual written minutes. Furthermore, except in certain limited circumstances, the subsidiary conducts business on its own. In point of fact, AC entered into the contract with Barnco without seeking parental endorsement.
Barnco does accurately observe that Arkla, AC, and their other corporate subsidiaries would occasionally share employees. Even so, as explained by John Baker, president of AC, each entity contributed to his pay when he worked for more than one subsidiary. Although Tom Siguaw, an engineer, functioned within several Arkla divisions, nothing in evidence shows that the different companies failed to augment his income in relation to their use of his services. Nor are we impressed by the fact that several of the same individuals served on the boards of both Arkla and AC.
Accordingly, the jury clearly erred in finding AC to be merely the alter ego of its parent company.

Termination of the Contract
Arkla and AC next contend that the jury erred in concluding that they, not Barnco, terminated the contract. Although concluding that the jury indeed erred, we find that the ultimate award remains supported by the record.

BARNCO'S APPEAL

Partial Exclusion of Expert Testimony
Plaintiff complains that the trial court excluded certain expert testimony and reports concerning damages. Determining that the two expert witnesses in question lacked the experience and expertise to project future *993 market conditions, however, the trial court correctly limited their testimony to the calculations made in accordance with the five-year plans.

Jay Fishman's Testimony
Despite plaintiff's protestations, Jay Fishman, an expert called by defendants, did not give legal opinions but, instead, simply noted the actual contract provisions pertinent to his testimony regarding Barnco's potential economic loss. Thus, the lower court did not err in this regard.

Jury Instructions
The instructions given at trial correctly reflect the law of damages in a breach of contract case, and we note no error in the district court's rulings.

DAMAGES
Contrary to the arguments presented by both parties, the $2,000,000 award does not constitute an abuse of the jury's discretion.

CONCLUSION
Accordingly, for the foregoing reasons, we reverse the judgment against Arkla, Inc., but affirm in all other regards. Costs of this appeal are assessed two-thirds to Barnco and one-third to Arkla Chemical Corporation.
REVERSED IN PART; AFFIRMED IN PART.
NORRIS, J., concurs in the result.
STEWART, J., concurs in part and dissents in part with written reasons.

UNPUBLISHED APPENDIX
The following assignments of error, set forth in the published opinion, are further discussed below for the benefit of the parties. See URCA Rule 2-16.3.

ARKLA AND AC'S APPEAL

Performance Under the Contract
In their primary assignment of error, defendants contend that the jury wrongly concluded that Arkla and AC "failed to perform the obligation of the January 23, 1990, Distributorship Agreement by not promoting diligently and in good faith the sale and distribution of induction generator systems through the territory." That contention, however, falls short of the mark.
It is well settled that a court of appeal may not set aside a trial court's or jury's factual finding in the absence of manifest error or clear wrongness. And, where there is conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are equally reasonable. Stobart v. State, DOTD, 617 So.2d 880 (La.1993); Harrison v. Gore, 27,254 (La.App.2d Cir. 08/23/95), 660 So.2d 563, writ denied, 95-2347 (La.12/08/95), 664 So.2d 426; Gardner v. McDonald, 27,303 (La.App.2d Cir. 08/23/95), 660 So.2d 107, writ denied, 95-2349 (La.12/15/95), 664 So.2d 453. If the trial court or jury findings are reasonable in light of the entire record, the court of appeal may not reverse even if convinced that it would have weighed the evidence differently as the trier of fact. Id.
In the January 23, 1990 contract, AC promised to market and sell the In-Gen system on behalf of Barnco. Specifically, the distributor's obligations included:
6.01 [An agreement] to promote diligently and in good faith the sale and distribution of INDUCTION GENERATOR SYSTEMS through the TERRITORY. Such efforts shall include Arkla[1] adequately training and maintaining a continuous sales effort through independent sales representatives, distributors and employees to promote and sell INDUCTION GENERATOR SYSTEMS throughout the TERRITORY.
6.02 [An agreement] to promote the INDUCTION GENERATOR SYSTEMS through reasonable advertising, as well as the promotion of the INDUCTION GENERATOR SYSTEMS in trade shows and other promotional opportunities to the same extent that Arkla promotes its own products. All such advertising and promotion shall be at the expense of Arkla.

*994 6.03 [An agreement to] provide Barnco with sales and order projections on a quarterly basis for the next six (6) month period. Such projections will be reasonable efforts to project the number of units to be sold or shipped during the six (6) month period. The projections shall be used by Barnco for planning purposes and shall not obligate Arkla to purchase the units shown in the projection.
6.04 [An agreement] to diligently pursue the commercial exploitation of the sale of INDUCTION GENERATOR SYSTEMS in all applications in the TERRITORY.
Marketing efforts began soon after finalization of the contract. In addition to the five existing employees who devoted most of their time to the In-Gen product, AC engaged Kemp as a full-time, salaried sales manager. He possessed considerable experience in the primarily-targeted oil field trade, and the company expected him initially to serve in a sales capacity and, later, as the business progressed, to move toward managerial status. Working together, Kemp and the AC staff began to initiate the venture.
Earlier, an engineer studied the product and found an application for the system within Arkla. Endeavoring to show customers a working model, the company installed one demonstration unit with exposed and labeled controls, working diagrams, etc. From that display, AC produced an explanatory video and brochure. Then, striving to disseminate these ideas, the AC team took their promotional tools to various trade shows.
The sales force, consisting of the AC employees, Kemp, and several independent sales representatives supporting the In-Gen project, also made direct contact with prospective buyers. So too, among other efforts, the company's accounting division formulated a program enabling the sales staff to project with ease the savings a purchaser might expect from utilizing an In-Gen. Likewise, AC eventually contracted for Reda Pump Company ("Reda")[2] to act as a subdistributor. In early 1991, upon providing the Reda agents with a well-prepared manual and extensive training, AC commissioned these individuals to begin contacting Reda customers to explore "fits" between the electric submersible pump and the In-Gen. By employing all of these measures during the first sixteen months of the Barnco contract, AC made a total of 340 customer contacts and submitted ninety-one proposals that could have generated sales for 339 In-Gen units. Unfortunately, no sales followed.
Defendants maintain that several factors hampered In-Gens sales. They first note that the customers targeted for this type product make their capital expense budget in the fall of the year before the purchase is made. Thus, when the distributorship contract became effective in January 1990, these prospects had already committed their funding for 1990. Furthermore, in most instances, these same entities preferred investments that earned, rather than saved, money.
AC also maintains that Barnco had overpriced the In-Gen. After buying a generator and engine "off the shelf" and building a control panel to connect those two components, Barnco actually doubled its cost to charge approximately $100,000 for the standard unit. Potentially, customers could save a considerable sum by furnishing their own engine, although Barnco discouraged that practice. Yet, with the product and installation figures so high, prospective buyers found the projected payout period[3] unacceptable. Other relevant factors included the poor quality of gas available at some sites and the realization that, in some situations, only part of the normal electricity costs could be significantly lowered.
Overall, defendants discovered the In-Gen market to be substantially smaller than they *995 first believed. At trial, they solicited testimony from several potential customers who initially expressed interest but eventually chose not to purchase the system. Representatives of these companies generally explained that, despite their fascination with the In-Gen concept, the product failed upon closer examination to meet their internal needs and constraints. Not only that, Waukesha-Pearce Industries, an engine manufacturer, had met with absolutely no success in its attempts to sell induction generators during the early 1980's. In fact, that enterprise eventually liquidated its sole unit for parts.
Plaintiff's main complaints stemmed from defendants' failure to hire any full-time, salaried sales engineers. Within the distributorship agreement itself and the underlying negotiations, however, nothing obligated AC to secure such employees. Instead, AC chose to minimize its initial expenses by engaging independent sales representatives as provided in the contract. The company's prevailing philosophy had been "to crawl before walking, and to walk before running." Essentially, AC intended to generate some degree of success and profit before expanding its effort.
Under these circumstances, if seated as the fact-trier, this court possibly would have reached a different conclusion than did the jury on this issue. Even so, sufficient evidence within the record provides a reasonable factual basis for the jurors' assessment. Most significantly, Barnes and his associates made a limited number of sales both before and after the sixteen months controlled by the distributorship contract. Thus, the panel could have concluded that AC's complete lack of sales success indicated a failure to promote In-Gens diligently and in good faith. Furthermore, Kemp recounted how several near-sales had been frustrated by AC actions, inactions, or policies.
Consequently, in light of the manifest error standard, we are constrained to say that this assignment of error lacks merit.

Termination of the Contract
Arkla and AC also contend that the jury erred in concluding that they, not Barnco, terminated the contract. Defendants further maintain that, by opting to extinguish the contract, plaintiff deprived AC of the subsequent legal right and ability to market the In-Gen system so as to mitigate any damages. It is thus urged that Barnco cannot now request an award for future lost profits. Upon review, although concluding that the jury indeed erred, we find that the ultimate award remains supported by the record.
In its original petition, Barnco actually asserted that it had officially terminated the distributorship agreement on May 31, 1991, due to defendants' continual breaching of the contract's intent and purpose as well as their failure to pay certain sums owed. Contending that Barnco had accordingly elected a remedy which limited damages to those losses occurring prior to May 31, 1991, Arkla and AC moved for, and the trial court granted, partial summary judgment to that effect. On appeal of that aspect, see Barnco International, Inc. v. Arkla, Inc., 628 So.2d 162, 167 (La.App. 2d Cir.1993), writ denied, 94-0397 (La.04/04/94), 635 So.2d 1105, we determined that because Barnco had terminated the contract "the doctrine [of election of remedies] may be available to [Arkla and AC] in this case to limit [Barnco's] damages to those resulting from [defendants'] actions before termination, if it can be shown Barnco gained an advantage by termination or caused detriment or change of situation to [defendants]." Thereafter, in contradiction of their earlier allegations and in a transparent effort to ensure recovery of damages through the end of the contract, plaintiff amended its petition to state that Arkla and AC had terminated the agreement by their nonpayment on three ordered units.
The record reflects that, in seeking to smooth over a misunderstanding in the spring of 1991,[4] AC agreed to purchase three In-Gens from Barnco. As per the then-existing *996 distributorship contract, Barnco immediately billed AC for one-half of the price, which the buyer timely remitted. According to the agreement, when the units had been completed, the manufacturer would issue another invoice requesting final payment (actually for one-fourth the price, since AC's profit share would satisfy the other one-fourth).
Shortly thereafter, as previously indicated, conflicts surrounding the general lack of sales success prompted the parties to begin negotiating a new contract concerning the distributorship. During those discussions, Barnes recommended that payment for the In-Gens then under construction should be tied to the finalization of the new contract. Yet, when the units had been completed for delivery,[5] Barnco sent AC an invoice. In that no new contract had been perfected and negotiations were continuing, however, defendants assumed that the final compensation had not become due. They continued in that belief until Barnco unexpectedly sent its termination letter. At that point, the contract had plainly been concluded through an exercise of the dissolution clause.
Under such circumstances, the issue of whether the contract had been "terminated," and by whom, presented a mixed question of law and fact. Not only that, the jury's legal determination as to this aspect is patently incorrect. Despite indicating that the invoice could be settled at a later time, Barnco chose to utilize the termination clause of the January 1990 contract and, thus, elected its remedy.
Even so, to benefit from the doctrine of election of remedies, defendants faced the requirement of proving that Barnco gained an advantage by the termination or caused detriment or a change of situation for defendants. Although we have concluded that AC's efforts generally did not suffice under the contract, those endeavors continued to increase and probably would have eventually resulted in various sales. Therefore, Barnco's election to terminate the contract, on May 31, 1991, deprived AC of any ability to mitigate damages through continued marketing effortsa definite change of situation for defendants.[6]
Nevertheless, the damage award will remain unchanged. Even solely considering AC's failure to perform before the date of termination, the record before us can be explained in terms that justify the $2,000,000 sum. Said another way, the award can be rationalized without any reliance upon profits Barnco allegedly lost after May 31, 1991.

Damages
Defendants, in their final two assignments of error, ask that the award be reduced both in light of plaintiff's failure to carry its burden of proof regarding damages and to reflect the benefit Barnco received, in the form of later sales, from AC's pre-termination marketing efforts. Finding no clear abuse of the jury's discretion, we reject these requests.
By long-standing legal principle, only actual damages are allowable and must be established with reasonable certainty, not by remote and conjectural estimates of loss. Guillory v. Terra International, Inc., 613 So.2d 1084 (La.App. 3d Cir.1993), writ denied, 619 So.2d 1063 (La.1993), and authorities therein. The law, however, is also well settled that, when there is a legal right to recover damages but the amount cannot be established with precision, the courts have reasonable discretion to make an assessment based upon all of the facts and circumstances of the particular case. Id. See also La. C.C. Art.1999; Stonecipher v. Mitchell, 26,575 (La.App.2d Cir. 05/10/95), 655 So.2d 1381; *997 Coffin v. Board of Supervisors, LSU, 620 So.2d 1354 (La.App. 2d Cir.1993).
In resolving whether the trial court abused its discretion by making an excessive award, the appropriate test is to determine whether the granted sum can be supported under a reasonable interpretation of the evidence most favorable to the plaintiff. Coffin, supra. Barnco, as previously mentioned, sought to demonstrate that AC's unacceptable efforts closed a window of opportunity for Barnco to generate profits. Hence, the jury could have rationally assessed a value to the delay Barnco experienced in receiving its profits.
Upon examining defendants' other complaint, we reach a similar conclusion. Even if some of Barnco's post-termination sales are partially attributable to AC's initial efforts, it can certainly be said that the distributor's failure to render full performance under the contract caused a postponement in consummation of those transactions. Further, the record clearly indicates that Barnco personnel exerted additional efforts to recover any ground lost with these clients and to finalize the sales process. These assignments of error, thus, lack merit.

BARNCO'S APPEAL

Partial Exclusion of Expert Testimony
Plaintiff's first assignment of error complains that the trial court excluded certain expert testimony and reports concerning damages. Specifically, Barnco sought to have two accountants utilize the Pronsky and Shobe five-year business plans to extrapolate sales over the entire ten-year term of the distribution agreement. Of course, as previously explained, Barnco's termination of the contract precludes its recovery of full-term lost profits. Hence, any error with respect to the present assignment would be harmless. Even so, determining that the two witnesses, Wayne Wilson and Arnold Lincove, lacked the experience and expertise to project future market conditions, the trial court correctly limited their testimony to the calculations made in accordance with the five-year plans.
Contrary to plaintiff's appellate argument, both business plans (in addition to a third plan prepared for Barnco before its involvement with AC) entered into evidence, thus allowing the jury to consider the included sales projections. Further, in closing argument, Barnco's attorney asserted that the lost profits calculated by his witnesses for the contract's first five years could be doubled to determine the correct damage award for the ten-year term.
If scientific, technical, or other specialized knowledge will assist the fact-trier in understanding the evidence or determining an issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may appropriately testify in the form of an opinion or otherwise. La. C.E. Art. 702. Clearly, however, broad discretion rests with the trial judge in deciding which witnesses are qualified as experts, and the breadth and scope of that expert testimony. Manchack v. Willamette Industries, Inc., 621 So.2d 649 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1170 (La.1993); State v. Mays, 612 So.2d 1040 (La.App. 2d Cir. 1993), writ denied, 619 So.2d 576 (La.1993). Such a ruling will not be overturned absent an abuse of discretion. Kitchura v. State, DOTD, 583 So.2d 52 (La.App. 2d Cir.1991). In the case sub judice, although the experts could base their opinions on facts supplied by other witnesses, the court did not permit Wilson and Lincove to weigh or comment upon the validity of the previously-prepared business plans. Inasmuch as that evaluation remains within the province of the fact finder, the court did not err in its ruling. See Martinez v. Schumpert Medical Center, 27,000 (La.App.2d Cir. 05/10/95), 655 So.2d 649.
Plaintiff further contends that the ten-year mathematical extrapolations of damages, performed by Wilson and Lincove, should have been admitted into evidence even without any proven expertise in marketing projections on the part of these witnesses, or any familiarity with Barnco or the In-Gen product. In support of this contention, plaintiff cites several cases which we find to be neither controlling nor convincing on this issue. Where an expert has extensive experience and specialized knowledge in a *998 certain type of business, and can explain in detail the methodology and background information used to arrive at his profit projections, it is not clearly erroneous to allow him to testify about anticipated profits. See Lee Shops v. Schatten-Cypress Co., 350 F.2d 12 (6th Cir.1965), cert. denied, 382 U.S. 980, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556 (2d Cir. 1970); Computer Systems Engineering, Inc. v. Qantel Corp., 740 F.2d 59 (1st Cir.1984). Similarly, when a business has been successful for such a length of time that profits are reasonably ascertainable, or where a comparable business selling the same type of product exists at the identical location, experts have been accepted to testify regarding their own detailed and thorough analysis of a plaintiff's projected future profits. See Mosley & Mosley Builders, Inc. v. Landin, Ltd., 87 N.C.App. 438, 361 S.E.2d 608 (1987); Chung v. Kaonohi Center Co., 62 Haw. 594, 618 P.2d 283 (1980). Nor does it constitute an abuse of discretion to admit a qualified accountant's opinion that submitted analyses have been formatted consistently with accounting standards and that the correct inflation factor has been used. See In re: Merritt Logan, Inc., 901 F.2d 349 (3d Cir.1990). As can readily be observed, however, these situations are quite dissimilar to the instant circumstances.
Barnco relies most heavily on Perma Research v. Singer Co., 402 F.Supp. 881 (S.D.N.Y.1975), affirmed, 542 F.2d 111 (2d Cir.1976), cert. denied, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976), and Super Valu Stores v. Peterson, 506 So.2d 317 (Ala.1987). In the latter case, the plaintiff called an expert market analyst for quite sophisticated extrapolations from the defendant's own profit projections concerning a product with a proven track record (groceries), and resulting from a sales prediction program that had previously made consistently accurate forecasts about other stores in the same chain. Neither the accountants' expertise, the product, nor the original projections in the matter at hand can be viewed in that same light.
In Perma Research, the Federal Second Circuit affirmed the trial judge's damage award where he initially determined which of the sales projections for the first half of the contract term would be most reliable. Then, utilizing all of the information provided during trial, the fact-trier extrapolated those estimates over the remaining five years of the agreement. Notably in that instance and in contrast to plaintiff's attempts in the present matter, a witness, under the guise of expertise while lacking knowledge of the market and the product, did not make such an extrapolation.
Barnco could have easily procured a marketing expert to conduct independent research and then evaluate any future lost profits based on proper factors.[7] Instead, plaintiff relied upon the testimony of two certified public accountants, with no knowledge of the product or market, to perform mathematical calculations extrapolating lost profits over the entire contract term. This assignment of error is meritless.

Jay Fishman's Testimony
As their last witness, defendants called an expert in business valuation and economic loss calculations, Jay Fishman. During his testimony, Barnco objected that the witness had given legal opinions. On appeal, the issue is again presented.[8]
In Pugh, Force, Rault, & Triche, Handbook on Louisiana Evidence Law, the authors' notes to La. C.E. Art. 702 caution against allowing an expert witness to comment *999 upon the law, lest those statements confuse the jury. See also Morrison v. Johnston, 571 So.2d 788 (La.App. 2d Cir. 1990), writ denied, 575 So.2d 367 (La.1991). Our review of the record, however, discloses that Fishman did not give legal opinions, but, instead, simply noted the actual contract provisions pertinent to his testimony regarding Barnco's potential economic loss. Thus, we find error neither in the lower court's admission of this expert's statements nor in its refusal to admonish the jury on this topic.

Jury Instructions
As its next assignment of error, plaintiff contends that the trial court failed to instruct the jury, fully and correctly, regarding the law of damages in a breach of contract case. In order for this court to consider whether a trial court properly instructed the jury regarding appropriate legal standards, La. C.C.P. Art. 1793(C) clearly establishes a mandatory procedural rule for preserving an objection to the denial of a requested charge. The litigant must specifically state on the record the complaint as to each special charge refused and the grounds for each objection. DeRouen v. Audirsch, 25,847 (La.App.2d Cir. 06/28/94), 639 So.2d 476; Luman v. Highlands Ins. Co., 25,445 (La.App.2d Cir. 02/23/94), 632 So.2d 910; Petitto v. McMichael, 588 So.2d 1144 (La. App. 1st Cir.1991), writ denied, 590 So.2d 1201 (La.1992). A blanket objection, without assigning reasons, does not comply with this codal requirement. Luman, supra; Petitto, supra.
At the jury charge conference,[9] plaintiff noted its objections to the court's refusal to include the language of La. C.C. Art. 1999 and to the positioning of La. C.C. Art. 2018. Now, on appeal, Barnco simply complains that the judge did not provide accurate instructions regarding damages, thus posing a general grievance neither properly preserved in the trial court nor correctly before us. See DeRouen, supra: Menzie Tile Co. v. Professional Centre, 594 So.2d 410 (La.App. 1st Cir.1991), writ denied, 600 So.2d 610 (La. 1992).
Even so, we note no error in the court's rulings or its instructions to the jury. Adequate jury instructions, of course, are those that fairly and reasonably convey the issues and provide correct principles of applicable law. That being so, the sufficiency of a jury charge will be determined in light of the charge as a whole, and the trial judge is not required to use the precise language submitted by the litigants. Rowsey v. Jones, 26,823 (La.App.2d Cir. 05/10/95), 655 So.2d 560; Sneed v. Satcher, 597 So.2d 1070 (La. App. 2d Cir.1992). Even if the requested instructions are fair statements of the law, the trial judge need not include them verbatim but may strike a fair balance so that no one issue is unduly emphasized. Sneed, supra. An appellate court must exercise great restraint by setting aside the verdict only where the instructions misled the jury to such an extent as to prevent it from doing justice. Rowsey, supra.
Despite the exclusion of La. C.C. Art. 1999, the substance of this article is well covered within the charge given. Further, the court twice read La. C.C. Art.2018 to the jury, verbatim. We certainly see no need for a third reading within the context that plaintiff suggested. Although Barnco also requested an instruction generally indicating that the primary aim of the law of damages is to place the plaintiff in the same position in which he would have been if the contract had been fulfilled, or to place the plaintiff in the position he would have occupied had the contract breach not occurred, the only two cases plaintiff cited in direct support of that proposition reflect that such an instruction would require substantial explanation. See Friedman Iron & Supply Co. v. J. B. Beaird Co., 222 La. 627, 63 So.2d 144 (1952); Security National Bank of Shreveport v. Terrell, 459 So.2d 131 (La.App. 2d Cir.1984). Specifically, in pursuing this broad principle on damages, both these decisions demonstrate that great care must be exercised to ensure that the plaintiff is not actually placed in a better *1000 position than he would have attained had the contract been performed.
In the case at hand, the instructions given adequately cover these subjects without adding the confusion that could have otherwise resulted. Thus, the assigned error is without merit.

Damages
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and the appellate court should conduct its own independent, de novo review of the record before it. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.02/20/95), 650 So.2d 742; Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); see also Smith v. Arkansas Louisiana Gas Co., 26,180 (La.App.2d Cir. 10/22/94), 645 So.2d 785, writ denied, 95-0035 (La.03/10/95), 650 So.2d 1179. In a final assignment. Barnco contends that the cumulative effect of the previously-mentioned errors works to taint the jury verdict regarding damages. Yet, given that plaintiff's complaints are all meritless, no need arises for the requested de novo review.
Moreover, the record clearly does not reveal an abuse of the lower court's broad discretion in assessing general damages. See Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In determining an amount that would adequately compensate Barnco for any losses resulting from the breach, the jury could well have found the testimony of Fishman to be convincing. This expert explained that, inasmuch as the market for the In-Gen still exists, any profit postponement suffered by plaintiff does not amount to a complete loss. Thus, the record can be reasonably interpreted to support the $2,000,000 award as adequate remuneration for such a delay and to provide the company with funds to organize its own large-scale sales endeavor.
STEWART, Judge, concurring in part and dissenting in part.
I concur in the result reached by the writer's opinion, however, I dissent as to the form of the opinion and the failure to publish the appendix.
U.R.C.A. Rule 2-16.1 states the majority of the panel which decides the case should determine the form of the opinion. It goes on to indicate the criteria to be used in making this determination. U.R.C.A. Rule 2-16.2 states the majority of the panel shall determine whether or not an opinion will be published based on certain reasoning.
A full opinion as defined by the U.R.C.A was circulated to the members of the panel for review, comment, and signature as an unpublished opinion. A minor revision was suggested by one member of the panel, but the majority of the panel voted to publish the opinion as circulated. That opinion was eighteen pages in length and had a complete discussion of the important assignments of error.
After the eighteen page opinion was circulated and a majority voted to publish, the writer redrafted and circulated the instant opinion with much of the former opinion contained in the "unpublished appendix." The seven page memorandum, in my opinion, does not adequately explain the court's reasoning and quite frankly cannot be understood without the "appendix."
On December 1, 1993, this court reversed a partial summary judgment granted in this matter. This opinion was published at 628 So.2d 162 (La.App. 2d Cir.1993). This opinion started a discussion on the election of remedies doctrine and left open the door on the ability of Barnco to recover future lost profits after termination of the contract. Obviously that panel realized the importance of these issues to the public by assigning it for publication. Therefore, anyone researching those issues would look to the present opinion for resolution of those issues. However, under the writer's approach, the entire discussion and resolution of the issues raised in the previous published opinion of this court is now contained in the unpublished "appendix" and according to U.R.C.A. Rule 2-16.3 has no precedential value.
This case was submitted after oral argument for a decision by this panel. After a lengthy review of the twenty plus volume *1001 case, the majority of this panel reasoned that, the criteria under U.R.C.A. Rules 2-16.1 and 2-16.2 having been met, a full published opinion should be rendered. I respectfully dissent from the writer's failure to include the material contained in his appendix in a full published opinion.
Before NORRIS, HIGHTOWER, WILLIAMS, STEWART and GASKINS, JJ.

On Rehearing
As counsel of record in the above captioned case, you are hereby notified that the application for rehearing filed by plaintiff/appellant has this day been DENIED. Plaintiff's motion for En Banc Hearing on Rehearing has this day been denied. Plaintiff's motion to Transcribe the Oral Argument in this proceeding has this day been denied. Plaintiff's motion to publish the full opinion has this day been granted. Judges HIGHTOWER and GASKINS dissent to the publication, with Judge HIGHTOWER assigning written reasons.
HIGHTOWER, Judge, dissenting as to publication on rehearing.
With respect to publication of the appendix, I respectfully dissent.
The disposition reached in the opinion, save in two minor aspects fully enunciated in the published portion, essentially constitutes an affirmance of the jury verdict. More importantly, the opinion clearly does not satisfy the standards normally demanded for publication, see URCA 2-16.2, and should be approached accordingly by any reader. No new law has been established or altered. We have criticized no existing law. Neither party asserted, nor did we find, any apparent conflict of authority requiring resolution. Nothing within the opinion will affect established case law or legislative history. And, relevant only to the litigants, the matter scarcely engenders overwhelming or continuing public interest.
Forests have been felled, and untold law library shelves filled, in providing paper and space to indulge legal opinions that have little interest to anyone other than the adversarial parties. This is just such an opinion.

APPLICATION FOR REHEARING
Before NORRIS, HIGHTOWER, WILLIAMS, STEWART and GASKINS, JJ.
Rehearing denied.
NOTES
[1] For sake of brevity, we both limit our discussion of this voluminous record to those facts most salient to the resolution of this matter and address, for publication, only those issues requiring reversal. Other assignments of error have been reviewed in an unpublished appendix.
[2] AC had agreed to purchase three In-Gen units from Barnco for its own use and in an effort to settle differences with Barnes.
[3] In pertinent part, that section of the distributorship agreement states, "Failure to make payments as provided hereunder shall result in immediate termination of this Agreement."
[4] The Barneses have not appealed.
[1] The contract specifically denotes that "Arkla" refers only to Arkla Chemical Corporation.
[2] During mid-1989, Barnco's negotiations with this company almost resulted in Reda being the sole distributor. This manufacturer of electric submersible oil field pumps could, in certain circumstances, provide an ideal application for the In-Gen. But, because Reda could not decide quickly, Barnco chose to pursue an arrangement with AC.
[3] The payout period is the amount of time required for the unit to pay for itself through savings.
[4] Barnco believed that Shobe had taken affirmative steps to thwart three sales that Barnes had arranged. The potential buyer testified, however, that AC's actions did not cause him to delay or cancel his purchase. In fact, when certain business factors had been resolved, he proceeded with the acquisition.
[5] AC had previously instructed that the units not be delivered until a site for their use had been determined.
[6] Immediately following the "termination" question, and despite the preceding response indicating that plaintiffs had not so terminated the contract, the interrogatory form (question 7(b)) illogically also asked if the termination by plaintiffs caused them to gain an advantage or caused detriment or a change of position to Arkla or AC. Thus, the form of this secondary question demanded a negative answer, as in turn given, in order for the jury to remain consistent in its replies. Moreover, any finding that defendants did not suffer detriment or change of situation is clearly wrong.
[7] Of course, plaintiff had already solicited the testimony of Bob Spears, the expert who prepared Barnco's original marketing study and upon whose conclusions the other business plans had been based. Yet counsel failed to explore the matter of future profits with either this witness or their marketing expert, Don Dixon.
[8] Technically, plaintiff abandoned this assignment of error. See URCA 2-12.4: Peoples Homestead Federal Bank & Trust v. Laing, 25,784 (La.App.2d Cir. 05/04/94), 637 So.2d 604. Discussion of this issue does not properly appear in the "Argument" section of plaintiff's brief; rather. it is mentioned within the thirty-eight page "Statement of the Case." In the interest of judicial efficiency, however, we will address the matter.
[9] After preliminary matters had been resolved off record, the court allowed each party an opportunity to preserve its objections for appeal.