**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 18, 2014

No. 12-31016

Lyle W. Cayce
Clerk

In the Matter of: DENISE M. BANKSTON,

Debtor

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HESS MANAGEMENT FIRM, LLC,

Appellee,

v.

DENISE M. BANKSTON,

Appellant.

Appeal from the United States District Court
for the Western District of Louisiana

Before OWEN and HAYNES, Circuit Judges and LEMELLE, District Judge.[*]

LEMELLE, District Judge:

In this adversary proceeding connected to the bankruptcy of Denise M. Bankston (Bankston), Hess Management Firm, L.L.C. (Hess) sought to enforce Bankston's guaranty on a contract between Hess and Premier Aggregates, L.L.C (Premier). The bankruptcy court held that Premier breached the contract in bad faith, but the court limited the damages award to $375,000. Hess appealed to the district court, which overruled the bankruptcy court and awarded Hess the

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

No. 12-31016

full value of the contract – $1.5 million. Bankston appealed to this Court. For the reasons enumerated below, we reverse.

## Facts and Procedural History:

The contract (Management Agreement or Agreement) had been entered into by Hess and Premier; Bankston was a member in Premier and served as a guarantor of the agreement. Hess sought to enforce the guaranty against Bankston following Premier's breach of the contract and subsequent insolvency.

The Agreement stated that Hess would provide certain management services related to the operation of the Fluker Pit, a gravel pit owned by Premier. In return for providing these services, Premier promised to pay Hess the greater of (1) $25,000 per month or (2) $0.50 per ton on all gravel produced by the Fluker Pit during a particular month. The Agreement provided for an initial term of five years and for the option of one-year renewals that could extend the term for another five years. The Agreement also provided that it could be terminated on certain conditions, as follows:

> [A]t any time, either party may terminate this Agreement as to that Managed Pit on 180 days notice provided that Owner [(Premier)] may only terminate this Agreement as to that Managed Pit if Manager [(Hess)] is then in default of any of its material obligations under this Agreement, which Manager has not cured within 5 days notice thereof, or if Owner permanently shuts down the use of that Managed Pit. If and when the Agreement has been terminated as to the last Managed Pit then subject to this Agreement, the Agreement shall be terminated except for those obligations that survive the termination of the Agreement. Notwithstanding the foregoing, in the event that the operation of a Managed Pit(s) is unprofitable, then Owner may terminate this Agreement with respect to that Managed Pit(s) on a one month advanced notice to Manager.

No. 12-31016

In addition, the Agreement separately provided that it could be terminated by Premier if Hess did not remedy any deficient performance within three business days of receiving notice. The parties executed the Agreement on November 6, 2007, but provided that the Agreement was retroactively effective as of August 21, 2007.

On November 30, 2007, Premier, through its attorneys, sent Hess a notice stating that it was "completely dissatisfied with Hess's performance as Manager" and warning Hess that if it did not begin performing fully within three days, Premier would terminate the Agreement. Hess responded through its attorneys, contending that Premier had made it difficult for it to perform its duties and observing that Premier had not paid Hess since the inception of the Agreement. On December 18, 2007, representatives of Premier met with Hess stating that Hess's services were no longer needed and asked it to vacate the premises. Premier's attorneys sent Hess a notice that the Agreement was terminated as of that date. Hess was thereafter excluded from carrying out any activities at the Fluker Pit.

After Premier's repudiation of the Agreement, on May 16, 2008, the Fluker Pit shut down. The Fluker Pit had operated at a loss from the inception of the pit's operations in August 2007. Although Hess never received notice of the shutdown under the procedures set out in the Agreement, on or about May 18, 2008, Hess's owner went to the pit to recover its remaining equipment. By observation, Hess was aware that the pit was shut down.

Hess filed suit in state court. Before a state court could rule on the matter, however, Premier and Bankston filed for bankruptcy. Hess then filed the instant adversary proceeding. After trial, the bankruptcy court ruled in favor of Hess.

No. 12-31016

It determined that Premier had breached the Agreement on two occasions: first, by failing to pay Hess at all for the months leading up to its repudiation of the Agreement, and second, by terminating the Agreement in December of 2007. Furthermore, it determined that the termination was in bad faith. Noting that Premier could have invoked the provision in the Agreement providing for termination on 30 days notice if the Fluker Pit was unprofitable, the court concluded that Premier's failure to do so signified their bad faith. No party contests this bad faith finding.

The bankruptcy court concluded that Hess was owed $375,000 in damages. To arrive at this figure, the court held that the ultimate shutdown of the Fluker Pit subsequent to Premier's breach limited damages to 180 days after the pit closed – the contractual period for adequate notice of closure. The court held that Hess was entitled to damages for the period from August 21, 2007, to approximately November 12, 2008, 180 days after the Fluker Pit's permanent shutdown in mid-May. Since the Fluker Pit never produced a sufficient tonnage to trigger the per-ton fee provision for compensation in the Agreement, the court concluded that Hess was entitled to $25,000 per month for that 15-month period, or $375,000.[1]

On appeal, the district court reversed the bankruptcy court's damages determination. Accepting the facts found by the bankruptcy court, the district court held that under Louisiana law the amount of damages owed accrues solely at the time of breach and is unaffected by post-breach events. In this case, as of the time of breach, Hess's damages consisted of the $25,000 monthly minimum

---

[1] The uncontroverted testimony at trial was that the $25,000 figure represented pure profit for Hess. R. at 1318, 1490.

No. 12-31016

payment for the sixty-month term of the Agreement, or $1.5 million. The court concluded that the subsequent closure of the Fluker Pit was irrelevant to the determination of accrued damages. The court therefore entered a damages award of $1,427,216.87 plus interest to Hess, which the parties agreed was the present value of the $1.5 million due Hess under the Agreement. This appeal followed.

**Discussion**:

### Standard of Review

This Court reviews decisions of the bankruptcy court using the same standard of review as the district court. *The Cadle Co. v. Pratt* (*In re Pratt*), 524 F.3d 580, 584 (5th Cir. 2008). "The bankruptcy court's findings of fact are reviewed for clear error; its conclusions of law are reviewed de novo." *Id.*

### Calculation of Damages

Louisiana has embraced the contract damages principle of "expectation" damages. 6 La. Civ. L. Treatise, Law Of Obligations § 14.3 (2d ed.) (citing Fuller and Perdue, "The Reliance Interest in Contract Damages," 46 Yale L.J. 52, (1936) and Farnsworth, Contracts 871 to 872 (2d ed. 1990)). Under this principle, the general purpose of contract damages is not to punish breaching parties or enrich non-breaching parties, but rather to produce the same result as would have occurred if there was no breach. As stated by the Louisiana Supreme Court, the calculation of damages should place the non-breaching party "in the same position he would have been in" had the contract been fulfilled. *Gibbs Const. Co., Inc. v. Thomas*, 500 So. 2d 764, 770 (La. 1987); *see also* Restatement (Second) of Contracts § 344 (1981) (stating expectation interest is one of the interests that contract damages are meant to protect and describing the interest

No. 12-31016

as the promisee "having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed"). A court must take "great care . . . to ensure that the plaintiff is not actually placed in a *better* position than he would have attained had the contract been performed." *Barnco Int'l, Inc. v. Arkla, Inc.*, 684 So. 2d 986, 999-1000 (La. Ct. App. 1996).[2]

With this general principle in mind, we move to more specific provisions of Louisiana law to determine at what point damages are properly calculated in the instant case: At the time of breach? Or at the time of trial, taking into account post-breach events? As this case demonstrates, the time when damages are calculated is critical, and can change the damage award amount. Premier breached the contract on December 18, 2007. If damages are calculated from that date, Hess would be entitled to damages amounting to the full term of the contract – as the district court concluded. However, this analysis should also consider what the parties contemplated and the eventual result – that the Fluker Sand Pit closed on May 16, 2008. Parties do not dispute that, had the sand pit closed in the normal course without bad faith breach, Hess would not be entitled to the full value of the contract. Indeed, the contract between the parties states "at any time, either party may terminate this Agreement as to that Managed Pit on 180 days notice provided that Owner [(Premier)] may only terminate this Agreement . . . if Owner permanently shuts down the use of that

---

[2] Louisiana is not unique in this view. Although the Restatement (Second) of Contracts recognizes two other forms of protected interests (reliance and restitution), expectation interest is by far the predominate measure in contract damage calculations. 24 Williston on Contracts § 64:2 (4th ed.) (finding "contract damages are ordinarily calculated based on protection of the disappointed promisee's expectation interest and are designed to secure for that party the benefit of the bargain that he or she made by awarding a sum of money that will place the promisee in as good a position as he or she would have occupied had the contract been performed"). Expectation damages are also the ordinary remedy for relief under the Uniform Commercial Code. 1 Hawkland UCC Series § 1-305:3 (stating "[i]n the usual case of breach of contract, so-called 'expectation' damages are awarded").

No. 12-31016

Managed Pit." Therefore, if the post-breach closure of the pit is taken into account, Hess would only be entitled to damages up to 180 days after the closure of the pit – as the bankruptcy court found.

Louisiana law does not speak to the effect that post-breach events – like the post-breach closure of the sand pit – have on contract damage calculations. As a general matter the Louisiana Civil Code states "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. Civ. Code art. 1995. This does not speak to when the damages are calculated (only how they are generally measured), and therefore fails to resolve the instant dispute.

The Code further instructs "damages are owed from the time the obligor has failed to perform." La. Civ. Code art. 1989. As is apparent, this provision deals with when damages are *owed* not when they are *calculated*. It also offers no guidance on post-breach events.

The Code's provision on bad faith damages similarly offers no answer. It states "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. Civ. Code Ann. art. 1997. The statute charges the court with finding what damages are a consequence of the breach, but again does not give a temporal point at which to begin calculation, or guidance on the effect of later events.

Finding no clear indication on the effect of post-breach events on damage calculations in Louisiana law, we look to secondary sources for guidance. The Louisiana Civil Law Treatise states "[i]n Louisiana, where breach of contract is concerned, the civil code supports the conclusion that compensatory damages are *assessed* as of the time of breach . . ." 6 La. Civ. L. Treatise, Law Of Obligations

§ 4.17 (2d ed.) (emphasis added). This passage seems to bolster the position that damages are calculated solely at the time of breach without regard to post-breach events – since the term "assessed" more clearly demands calculation than the statutory phrase "owed," and the time period is firmly defined as "the time of breach." However, upon closer inspection, the only case law cited by the treatise in support of this proposition is the district court's opinion *in this case*. *See id.* at n.7 (citing *Hess Management Firm, L.L.C. v. Bankston*, 2012 WL 4471121 (W.D. La. 2012)). The Court, reviewing this matter de novo, is not bound by the lower court's legal determinations, nor secondary sources relying solely on that interpretation.

No Louisiana Supreme Court opinion clearly resolves when damages are to be calculated. We are only able to find corollary cases that do not fully resolve the issue at hand. For example, in dicta in *Sharbono v. Steve Lang & Son Loggers*, 696 So. 2d 1382, 1388 (La. 1997), an attorneys' fees case, the court stated:

> [W]ith actions ex contractu-under C.C. art. 1989, damages are conceptually "due" from the date of an active breach, or from the date the defendant is put in default in the case of a passive breach. The later determination of the actual "amount" due relates back to that earlier date to allow for precise calculation of the amount of interest actually due to make the plaintiff whole.

*Sharbono*, 696 So. 2d at 1388.

While the concept that damages "relate[] back" to an earlier date might be read to support Hess's position that damages are set at the time of breach, in truth

the statement quoted above is aimed at the calculation of interest, and not the calculation of the principle damage figure. *See also L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc.*, 762 So. 2d 1223, 1239 (La. Ct. App. 2000) ("Interest on awards for active breaches of contract began to run 'from the moment' of an active violation of a contract under La. C.C. art. 1989.") . There seems good reason why the interest amount would begin to run immediately from the time of breach. As the court stated in *Sharbono*, this rule is necessary to make the non-breaching party whole – since, but for the breach, the non-breaching party would have had access to the funds throughout the entirety of the litigation. The same is not necessarily true in a case like the instant one, where post-breach events indicate that the non-breaching party would not have even been entitled to certain profits had the contract went to term.

Louisiana law being unclear, the Court is obligated to consider other provisions of Louisiana law and decide what the Louisiana Supreme Court would decide were it to hear the instant case. *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 431 (5th Cir. 2007).

Hess argues, and the district court found, that Hess is entitled to receive the full value of the contract – 60 payments of $25,000 each, for a total of $1.5 million. We disagree with the analysis by the learned jurist below.

By awarding Hess the full $1.5 million, Hess would be placed in a *better* position than it would have been had the contract been fulfilled. This would violate Louisiana's general principle of expectation damages. *See Gibbs,* 500 So. 2d at 770. Had the contract been in effect at the time the pit closed, Hess would not have been entitled to receive profits past180 days from the pit's closure. Thus, consistent with the concept of expectation damages, the Court finds that

No. 12-31016

the proper measure of damages was that found by the bankruptcy court – Hess is entitled to $375,000, based on damages sustained for the period from August 21, 2007 to November 12, 2008, 180 days after the Fluker Pit's permanent shutdown in mid-May. A contrary result would defeat the maxim of placing a non-breaching party in the same position they would have been had breach not occurred, and award Hess more than their expectation interest.

It should also be noted that the parties specifically contracted for the closure of the pit. The contract language allows the closure, if notice is provided. This evidences the parties understanding and foresight that the pit's closing was anticipated, and not an event that should result in a windfall of damages to Hess. 24 Williston on Contracts § 64:2 (4th ed.) (the "best measure of the value of the broken promise is the value assigned to it by the parties themselves"). It additionally makes this situation different than one where a fortuitous event prevents performance. Far from being unforseen, the closure of the pit was understood as a possibility by the parties, as evidenced by the contract terms allowing for closure of the pit.[3]

Further, we do not find that the statutory language of either the general damages provisions or the bad faith damages provision alters our analysis. The general damages language only speaks to the award being "measured by the loss sustained by the obligee and the profit of which he has been deprived." La. Civ. Code art. 1995. This does not guide the Court as to when the calculation is to

---

[3] Fortuitous events, sometimes categorized under the defense of impossibility, may serve to limit liability under Louisiana law. *See* La. Civ. Code art. 1873. Because the closure of the pit was not a fortuitous event, but rather one contemplated by the parties, the Court does not rely on that provision here.

No. 12-31016

take place – at the time of breach or post-breach. In terms of the profit that Hess was deprived of, we again reiterate that had the contract remained in effect, the pit would have closed and Hess would not have been entitled to any profits after 180 days of the closure. Therefore, Hess is not being denied profits it is entitled to after considering post-breach events, as contemplated by the parties.

Similarly, the slightly more specific statute on when damages are owed does not illuminate for the Court when calculation of damages occurs. La. Civ. Code art. 1989. That provision only speaks to when damages are owed, not when they are calculated. *Id.* For that reason, the Court is unable to reach the conclusion Hess draws – that damages are unequivocally set at the time of breach without regard to what happens following breach. On the contrary, when the statute is read in conjunction with the principle of expectation damages, it would be reasonable to find that a Louisiana court would rule that – although damages are owed at the time of breach – damage calculations may take place at a later date and account for post-breach events.

The bad faith damages provision also does not alter our conclusion. The bankruptcy court and the district court found that bad faith occurred – findings that we accept. The bad faith damages provision instructs us to award damages that were "a direct consequence " of the failure to perform. La. Civ. Code art. 1997. Hess has not argued that it sustained any derivative or collateral loss that can be directly linked to the breach of the contract. Instead, it only asks us to enforce the full value of the contract. Again, we conclude that a Louisiana court reviewing this provision would find that the bad faith damage clause does not enhance the damages owed Hess beyond the time the pit closed. Instead, giving full effect to the bad faith damages provision, we find that Hess is only able to

11

establish as a "direct consequence" of the breach damages up until the November 12th date. Awarding Hess damages beyond that point would not serve the provision's purpose of conferring damages consequentially linked to bad faith breach, but instead would punitively award damages unconnected with the facts surrounding breach.

In a different context, we find analogous support for our analysis in another provision of Louisiana law regarding damages. Specifically, Louisiana's rule on mitigation makes clear that a non-breaching party must take "reasonable efforts to mitigate the damage caused by the obligor's failure to perform." La. Civ. Code art. 2002. If a non-breaching party fails to mitigate damages, the breaching party "may demand that the damages be accordingly reduced." *Id.* Thus, in a mitigation case, despite damages being "owed" at the time of breach, the amount of damages may be reduced after an analysis of the non-breaching party's post-breach conduct and related events. This demonstrates that damages are not set in stone, and strengthens our conclusion that post-breach events may effect the amount of damages awarded.

## Conclusion:

For the foregoing reasons, we reverse the district court judgment and remand for further proceedings consistent with this opinion.

\*     \*     \*

12