# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 16-429

SWEET LAKE LAND AND OIL COMPANY, LLC

VERSUS

OLEUM OPERATING COMPANY, L.C., ET AL

**\*\*\*\*\*\*\*\*\***
## ON REHEARING
**\*\*\*\*\*\*\*\*\*\***
## APPEAL FROM THE
## FOURTEENTH JUDICIAL DISTRICT COURT
## PARISH OF CALCASIEU, DOCKET NO. 10-1272
## HONORABLE DAVID A. RITCHIE, PRESIDING
**\*\*\*\*\*\*\*\*\***

## SYLVIA R. COOKS
## JUDGE

**\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

**REVERSED AND REMANDED.**

Guy E. Wall
Paul E. Bullington
Jonathan R. Cook
Sara Lewis
Wall, Bullington & Cook, LLC
540 Elmwood Park Blvd.
Harahan, LA  70123
(504) 736-0347
**ATTORNEY FOR PLAINTIFF/APPELLANT**
   Sweet Lake Land and Oil Company, LLC

Paul Matthew Jones
Brian W. Capell
Liskow & Lewis
822 Harding Street
P.O. Box 52008
Lafayette, LA  70505-2008
(337) 232-7424
**ATTORNEY FOR DEFENDANT/APPELLEE**
   Oleum Operating Company, LC and AKSM, L.C.

**COOKS, Judge.**

This is an oilfield cleanup suit for restoration of property that was first filed in 2010. Sweet Lake Land and Oil Company, LLC filed suit against Oleum Operating Company, L.C., AKSM, L.C., and other oil and gas operators, lessees and assignees alleging that their operations caused environmental damage to its property.

The Sweet Lake property at issue is located in Calcasieu Parish and has historically been subject to oilfield exploration and production activities. The entire area of the Sweet Lake property comprised approximately 199 acres. The alleged contaminated areas at issue in this appeal comprised approximately 12 acres of this land. In 1947, Sweet Lake granted an oil, gas and mineral lease (hereafter "the 1947 Lease"). British Petroleum Corporation (hereafter BP) and its predecessors operated on the property from 1947 until 1989 under that lease. The record establishes BP drilled and operated numerous wells on the property pursuant to the 1947 Lease. Sweet Lake maintained in the course of operating the wells, BP produced brine or processed water, which it stored in pits near the various well sites. Processed water is an oilfield waste product that contains barium, arsenic and salt levels greater than seawater. Sweet Lake maintained BP even used a pit after they were outlawed in 1986. Sweet Lake also contended from 1985 until 1989, BP closed the pits improperly, leaving behind oil, barium, arsenic, benzene and salt.

From 1989 until 2008, the field was operated by a several smaller operators, including Flash Gas & Oil, Janex Oil, Arbol Resources, J&J Onshore and Oleum, which did not use pits. These companies however continued to operate under the 1947 Lease and continued oil production on Sweet Lake's land.

Prior to the lawsuit in question, in 2000, Sweet Lake sued J&J Onshore, an operator under the 1947 Lease, because it had received an environmental report

(the Covington Report) showing potential contamination at an oil facility located on the property covered by the 1947 Lease. During the pendency of the lawsuit, on May 19, 2000, pursuant to a Bill of Sale, J&J assigned its remaining interest in the 1947 Lease to Oleum. Sweet Lake added Oleum to the lawsuit. Sweet Lake then settled with Oleum, asserting it believed it could work with Oleum through the remaining issues identified in the environmental report, including Oleum restoring the C-3 well and others to 29-B requirements. The settlement required Oleum to plug and abandon certain wells within a specified period of time. Sweet Lake and Oleum also agreed to amend the 1947 Lease in 2003 to reduce the acreage covered by the lease and to provide express restoration obligations. The 2003 Lease Amendment stated that "[w]ithin 6 months of determining that any well among the Nos. C-2, C-3, C-7, C-8, or C-9 Wells have no future utility, Lessee shall plug and abandon the well and restore the surface area around the well to the requirements of Title 43, Statewide Order No. 29-B." Sweet Lake maintains Oleum has not complied with the settlement agreement, contamination still exists and wells remain unplugged.

In 2005, Oleum assigned the 1947 Lease to AKSM. Oleum and AKSM are family owned companies run by Michael Snell.[1] In 2008, the 1947 Lease expired and Oleum released it. Sweet Lake then granted a new oil and gas lease to AKSM following the release, which covered much of the same property. The 2008 Lease required AKSM to abandon what was referred to as the "Existing Oil Facility" on land located west of and adjacent to the land covered by the lease, and remove any contaminated soil from that area. Sweet Lake contended AKSM did not comply with this lease requirement.

By the time the instant lawsuit went to trial, only Oleum, AKSM and BP remained. As to Oleum and AKSM, suit against them was based in part on alleged

---

[1] Oleum is owned by Mr. Snell and his wife. AKSM is owned by the Snells and their children.

express restoration obligations they assumed in the 2003 Amendment to the 1947 Lease (as pertains to Oleum) and in the 2008 Lease (as pertains to AKSM). Sweet Lake put forth a damages model based on remediation plans that addressed five separate areas of the property. These areas were determined by Sweet Lake's experts to be in need of remediation. The defendants argued Sweet Lake greatly exaggerated the remediation necessary to clean up the areas. It should be noted that Oleum and AKSM basically adopted the remediation plan put forth by BP and did not put forth its own plan or hire any of its own experts to prepare reports or testify at trial.

The most costly area, referred to as Area 1, involved contamination that occurred at the C-3 wellsite. Sweet Lake's plan for that area anticipated it would require over $40 million to remediate the soil and approximately $8 million to remediate the ground water. The other area remediation plans were significantly less in cost than for Area 1.

BP presented an alternative remediation plan that totaled around $1.4 million for all five areas, with the bulk of that amount set aside for Area 1. Sweet Lake maintained BP's plans did not meet the 29-B requirements, because a less stringent standard was used.

Oleum argued Sweet Lake did not originally intend for Oleum to clean up the C-3 Well because one of Sweet Lake's experts testified he did not know if there was contamination there. Sweet Lake maintained the Covington Report indicated there was contamination there, which is why the 2003 Lease Amendment required Oleum to restore that site to 29-B requirements. Oleum also contended its obligation to restore the surface area around the C-3 Well to the requirements of 29-B did not require restoration of underground contamination to soil or groundwater.

At trial, Sweet Lake also maintained AKSM breached its obligation to remove any contaminated soil from the area surrounding the "Existing Oil Facility" pursuant to the 2008 Lease. AKSM introduced a 2010 report which concluded there was no contamination in the first two feet of soil. Sweet Lake maintained at trial that the area where AKSM removed two feet of soil was limited to a small area to the far north of the facility. Thus, they believed that the report was misleading and their experts countered that the area around the "Existing Oil Facility" was contaminated and had not been restored as required by the 2008 Lease.

The jury trial was held from May 11, 2015 through May 27, 2015. As to Oleum and AKSM, the jury was asked to determine, among other things, whether environmental damages existed on Sweet Lake's property, whether after July 7, 2003, Oleum breached its restoration obligations under the 1947 Lease as amended in 2003, and whether AKSM breached its obligation to remove contaminated soil from the existing oil facility. On May 27, 2015, the jury returned its verdict, answering in the affirmative that there was environmental damage on Sweet Lake's property, but it determined there was no breach by Oleum or AKSM of their respective obligations under the lease. On the jury verdict form where it asked "[w]ho is responsible for the environmental damage caused to Sweet Lake's property," the jury checked off only BP and not Oleum or AKSM. The jury verdict form later listed BP as 100% liable for the "damage to Sweet Lake's property." The jury also listed an amount of "1.5 million dollars" in response to the question on the jury verdict form as to "[h]ow much will it cost to clean up Sweet Lake's property?"

In accordance with the jury verdict, the trial court rendered a judgment on September 11, 2015, finding BP responsible for the environmental damage on Sweet Lake's property. To that end BP was ordered to submit a remediation plan

to the Department of Natural Resources (DNR), Office of Conservation, proposing to remediate the property to within applicable regulatory standards. The judgment stated that "Sweet Lake's claims for money damages against BP are hereby dismissed with prejudice." Pertinent to this appeal, the judgment also dismissed with prejudice all claims against Oleum and AKSM.

Sweet Lake moved for a Judgment Notwithstanding the Verdict (JNOV) and Alternative Motion for New Trial, seeking to set aside the judgment in regard to the jury verdict in favor of Oleum and AKSM. The trial court denied the motion.

This appeal followed, wherein Sweet Lake asserts the following assignments of error:

1) The jury erred in determining that Oleum did not breach its obligation under the 2003 Lease amendment to restore the property.

2) The jury erred in determining that AKSM did not breach its obligation under the 2008 Lease to remove any contaminated soil at the Existing Oil facility.

## ANALYSIS

Louisiana Revised Statute 30:29 (also known as "Act 312"), created a special procedure to resolve claims of environmental damage arising from oilfield operations. La.R.S. 30:29 applies to actions under Title 31, the Mineral Code. *M.J. Farms Ltd. v. Exxon Mobil Corp.*, 07-2371 (La. 7/1/08), 998 So.2d 16. Notably, § 29C(1) provides that if the finder of fact determines that environmental damage exists and determines the party or parties who cause the damage, then the court shall order those parties "whom the court finds legally responsible for the damage" to develop a plan of remediation. Under La.R.S. 30:29, property must only be remediated to applicable regulatory standards following a site-specific, defendant-funded, court-approved, and court-supervised remediation plan. See La. R.S. 30:29, et seq. The goal of the new legislation is not "perfect restoration," and

the reasonableness or unreasonableness of a defendant is not a factor in determining the cleanup standard. *Id.*

The Louisiana Supreme Court in *State v. Louisiana Land and Exploration Co.*, 12-884 (La.1/30/13), 110 So.3d 1038, 1049-51, stated:

> . . . The Act makes no changes to the normal trial procedures established by the Code of Civil Procedure. The only change accomplished by Act 312 is how the damages to remediate property are spent. Under Act 312, landowners do not receive that portion of the remediation damages award needed to fund the statutorily mandated feasible plan; these funds must be deposited into the registry of the court.
>
> . . .
>
> The matter proceeds to trial in the same manner as any other proceeding; no provision of the Act changes normal trial procedures. This means pre-trial discovery is conducted and the case proceeds in accordance with the Code of Civil Procedure. Unless a defendant admits responsibility or liability for "environmental damage" as defined by the Act, La.R.S. 30:29(I), all claims, including contractual or private claims, are determined by the finder of fact at trial.

Following trial, the litigation took two divergent paths. As to Sweet Lake's claims against BP, pursuant to La.R.S. 30:29, the matter proceeded to the Louisiana Department of Natural Resources for the determination of the most feasible plan for remediation of the property. Sweet Lake's claims against Oleum and AKSM for the breach of their express restoration obligations under the respective leases proceeded to a motion for JNOV, which was denied, and now, this appeal.

It should be noted that, as pointed out by counsel for Oleum and AKSM, the vast majority of Sweet Lake's arguments at trial centered on BP and their actions prior to assigning the 1947 Lease to another operator in 1989. Sweet Lake made it clear to the jury that it was only holding Oleum and AKSM responsible for what happened after 2003; in Oleum's case when it was assigned and then amended the 1947 Lease; and in AKSM's case when it was granted a lease in 2008.

It was confirmed by all experts for all sides that there was contamination on Sweet Lake's property and it was, to some degree, not in compliance with the

applicable law. Although the jury correctly found there was environmental damage on Sweet Lake's property, it also found there was no breach by Oleum of its restoration obligations under the 1947 Lease as amended in 2003 and there was no breach by AKSM of its obligation to remove any contaminated soil from the Existing Oil Facility as set forth in the 2008 Lease. These findings that Oleum and AKSM did not breach their obligations under the respective leases are the issues on appeal.

## I.     *Oleum's Restoration Obligations Under the 1947 Lease as Amended*.

The 2003 amendment to the 1947 Lease provided that "[w]ithin 6 months of determining that any well among the Nos. C-2, C-3, C-7, C-8, or C-9 Wells have no future utility, Lessee [Oleum] shall plug and abandon the well and restore the surface area around the well to the requirements of Title 43, Statewide Order No. 29-B." It was not disputed by Oleum that it had this obligation. During its closing argument, counsel for Oleum acknowledged as much, stating:

> So you got these five wells. Well, what happened, C-2, they're not claiming any damage. C-7 is still in use. The C-8, they're not claiming any damage. And the C-9 is still in use. That's four of the five wells.
> Now there's one more well – 'cause, again, we're gonna tell you what we agreed to and tell you why we did it; it's the C-3 well. And what you heard from Dr. Sagrera is that there may be some minor dirt work that needs to be done in that area, and we'd love to do it.

Thus, we find the record established Oleum had an express obligation to restore the land around the C-3 well to the requirements of Statewide Order 29-B.

The record also clearly establishes the experts found there was, at a minimum, "some minor dirt work" (although the degree of contamination is greatly disputed by the parties) that needed to be performed in the area around the C-3 well. Donald Segrera, who was BP's soil expert, testified that 0.79 acres around the C-3 well site required restoration. Thus, he proposed a remediation plan for that area, although his plan relied on an exception to the requirements of

Statewide Order 29-B. John Frazier, another expert called by BP, found contaminated soil at the C-3 well site which would need to be removed. Mr. Frazier also testified there was "[n]o question whatsoever" the contaminated soil he detected on Sweet Lake's property was caused by oil and gas operations. The reports of Approach Environmental and HET, BP's remediation expert, also confirmed contamination at the C-3 well site. Thus, the record is clear that contamination existed in the area surrounding the C-3 well site and that Oleum had an express obligation to restore the land around the C-3 well to the requirements of Statewide Order 29-B. The 2003 Lease Amendment requires that the C-3 be plugged and abandoned within six months after operations are ceased. The record confirms this was not done. The first question then becomes was Oleum prevented from performing this obligation by any actions of Sweet Lake?

Oleum argues, at trial and again before this court, that it needed Sweet Lake's consent to perform any work on the property. This argument was repeatedly voiced to the jury. During closing arguments counsel for Oleum commented "for us to go out there and do anything on the C-3 well, they have to give us permission to do so." Counsel for Oleum also stated in closing arguments that "there may be some minor dirt work that needs to be done in that area, and we'd love to do it."

There is nothing in the 1947 Lease, as amended in 2003, that requires Sweet Lake's consent for Oleum to perform the agreed upon remediation work. Further, Oleum did not need written consent under the 2008 Lease granted by Sweet Lake to AKSM because it was not a party to that lease. Thus, we find no merit to Oleum's argument that it needed consent from Sweet Lake to perform its remediation obligation.

Sweet Lake also notes that even if consent was required, Oleum did not ask for any consent from Sweet Lake to perform any remediation work until

approximately four years after suit was filed. This violates the provisions of the 1947 Lease (as amended), which required restoration of the surface area around the well site within six months of cessation of activities at the well. The record established that Oleum plugged the well on July 8, 2009. Thus, the lease required Oleum to perform its remediation obligations by January 8, 2010. There was absolutely no evidence in the record that Oleum was prohibited from remediating the property prior to suit being filed by Sweet Lake in March, 2010.

Moreover, of particular concern to this court, is the fact we find the testimony by Mike Snell and comments made during closing arguments by Oleum's counsel violated a Motion in Limine granted in Sweet Lake's favor to prevent any reference at trial to any offers, and responses as to any proposed remediation attempts, by Oleum and/or BP. A few months before the originally scheduled trial date, Oleum offered (in participation with BP) to clean up Sweet Lake's property according to the remediation plan put forth by BP. Sweet Lake refused the offer as it believed BP's remediation plan was woefully inadequate and only addressed a small part of the damages incurred.

Believing Oleum and BP would attempt to "create and introduce irrelevant evidence that is unfairly prejudicial," Sweet Lake filed a Motion in Limine to exclude any reference at trial to any offers, and responses as to any proposed remediation attempts, by Oleum and/or BP. Specifically, Sweet Lake argued BP and Oleum were attempting to remove any oversight over their remediation of the property. They noted in order to implement a remediation plan, a district court must order the submission of a plan to DNR, who is then required to conduct a public hearing on the plan or plans submitted. The district court retains jurisdiction once the claim is referred to DNR, and upon DNR's recommendation of a remediation plan(s), the district court must decide which plan should be implemented to remediate the property. *M.J. Farms v. Exxon*, 07-2371 (La.

7/1/08), 998 So.2d 16. Sweet Lake contended the communications from Oleum and BP attempted to circumvent DNR and the district court's authority to monitor the remediation, and did not allow any input from Sweet Lake. Thus, Sweet Lake maintained there was no evidence of any mitigation of damages by Oleum or any failure to mitigate damages on Sweet Lake's part because there was no approval from DNR or the district court to implement Oleum's proposed remediation plan.

Sweet Lake feared BP, Oleum and AKSM would use these communications between the parties to support their own credibility and attack Sweet Lake's credibility, implying Sweet Lake had no real intention of cleaning up the property. They noted such an argument would mislead the jury, because a finding of environmental damage and Oleum's responsibility for such damage mandates that such funds for remediation be deposited in the court registry and used only for remediation. See *State v. Louisiana Land and Exploration Company*, 12-884 (La. 1/30/13), 110 So.3d 1038, 1049 (wherein the court stated "Act 312 ensures the damages awarded for remediation will be used only for remediation to the extent necessary to fund the statutorily required plan, into which the La. DNR has input, and which is ultimately approved by the court.")

On August 13, 2014, the trial judge at that time, the Honorable D. Kent Savoie, ruled the evidence regarding the offer and response was to be excluded from the jury. The trial date was later rescheduled. After Judge Savioe was elected to the appellate court, the Honorable David A. Ritchie was assigned the case. A few days before the rescheduled trial was to take place, Oleum again sent correspondence to Sweet Lake's counsel offering to clean up the property. Judge Ritchie, prior to trial beginning, addressed arguments from Oleum's counsel as to whether evidence regarding the offer and response to clean up could be broached to the jury:

THE COURT:

Yeah, and look, I'm at a bit of a disadvantage here. [Judge] Savoie is the one that sat through the last several years of pretrial hearings and he knows a lot more about all the issues in this case and all the facts and everything related to this case than I do. So as I learn more about this case, as the case proceeds, it may be that it will make more sense to me as we go why something may or may not be appropriate to bring out.

MR. JONES (Counsel for Oleum):

Yes sir,

MR. WALL (Counsel for Sweet Lake):

Well, I would like to exclude this exchange of correspondence regarding their proposal.

THE COURT:

Can I see it?

MR. WALL:

Sure.

THE COURT:

I may have this.

MR. WALL:

Yeah, we filed this last week I believe.

THE COURT:

I was in court every day last week in criminal court and I didn't have a chance to look at any of that stuff. I had my law clerk look at some things for me, but let me see. Okay, it's just these two letters?

MR. WALL:

Those are letters that they want to introduce into evidence and that we believe should be excluded. It's communications between the lawyers. It deals with a proposal they had for cleaning up the property and plugging wells, which we said we'd get back to them on and it's precisely – it precisely falls within the ruling that Judge Savoie issued a year ago excluded this type of evidence.

MR. JONES:

Your Honor, may I respond briefly?

THE COURT:

Sure.

MR. JONES:

We do not intend to offer these without first consulting the Court and opposing counsel outside the presence of the jury pending trial developments. We'd ask that you defer your ruling until then, but again raising the concern that they are – without this sort of evidence they are allowed to offer in closing the argument that we never tried and that's not true.

MR. WALL:

Judge, this is –

MR. JONES:

I would simply just ask the Court to defer ruling on this and I will give you my commitment we will not refer to this in opening or through witnesses without asking the Court for a ruling once the Court has heard more about the case.

MR. WALL:

Judge, you hit the ball out of the park when you said this is a trial – a deceptive trial practice because that's what this exchange was all about for them. He sent me the e-mail, I responded, he immediately puts it in. He knew what was going to happen and he's just trying to create some—he's trying to create evidence that he can use at the 11th hour to make it seem like, oh, we've been trying to do this, we've been trying to do this, okay.

THE COURT:

Yeah, I mean this is something that happened. I mean this is an exchange that y'all had May 1st, ten days ago,

MR. JONES:

And all we ask, Your Honor, is that you defer ruling on this until you'veheard the testimony on the topic. Again, we will not – intend to introduce this without first consulting with you.

. . . .

THE COURT:

Well, look, the thing is this lawsuit was filed in 2010. All this stuff that just happened in the last couple of weeks I don't -- you know, it just – so you're saying on the first we agreed that we were going to do some stuff. We finally – we agreed that we're actually

going to do something to clean up because we think that's what you want us to do and we want to go forward to show you that we're good guys and we're trying to do what you want us to do and at the last minute and you want to introduce that to say, you know, if they say we haven't done anything over the last five years we want to show them that ten days ago we agree to do something.

MR. JONES:

No, Your Honor.

THE COURT:

What am I missing here? I mean this stuff at the last minute, it seems – I don't think it helps you. I think it makes you – I mean, you know, anyway.

MR. JONES:

All I would ask, Your Honor, is that you defer ruling on this issue until you've heard the testimony.

THE COURT:

Well, let me just say this.

MR. JONES:

Yes sir.

THE COURT:

My inclination, I will say this, is to say no, this isn't coming in.

MR. JONES:

Yes sir.

THE COURT:

We're not getting into this. This is some game it looks like to me and I'm not going to – I'm not going to play this game, I'm not going to let y'all play the game, but if something changes I will allow you to – I will agree to reconsider if something comes up and you think, okay, see judge this is why we thought it would be relevant and then at that point I will say, okay, well, you know what? Maybe it's now appropriate, but at this point I don't think it's – I don't have any intention of letting it in unless something changes.

Thus, it is clear the trial court excluded evidence relating to Oleum's offers to remediate made as trial was set to begin.

Despite this, during questioning from Sweet Lake's counsel concerning Oleum's duties under the 2003 Lease amendment, Mr. Snell violated the Motion in Limine by stating Oleum was not *allowed* to remove certain contaminated soil. Specifically, the exchange went as follows:

> Q. Okay. Have you restored the site for the requirements of Statewide Order 29-B either at the C-3 or the C-8 [areas]:
>
> A: To the best of my knowledge yes with a caveat that I think there's one bad sample on the C-8 that we were not – C-3 *that we weren't allowed to remove.*

Clearly this placed the inference before the jury that Oleum was not allowed to clean up a certain area due to Sweet Lake not allowing them to do so. Oleum acknowledged this was a reference to the offers that were excluded from being introduced by the Motions in Limine that were granted by the trial court.

Oleum asserts the testimony was elicited by Sweet Lake's own attorney while cross-examining Mr. Snell and there was no objection made to the responsiveness of the answer. Initially, we note any objection to the responsiveness of Mr. Snell's answer would have served to highlight the substance of the remark to the jury. Moreover, we agree with Sweet Lake that its failure to object is irrelevant, as it had already objected to this line of testimony when it filed the motions in limine and during trial when Oleum and BP proffered this line of testimony. Essentially, the granted motion in limine served as a continuing objection to that line of testimony. This court in *Whitehead v. Kansas City Southern Ry. Co.*, 99-896 (La.App. 3 Cir. 12/22/99), 758 So.2d 211, 218, *writ denied*, 00-209 (La. 4/7/00), 759 So.2d 767, stated:

> Opposing counsel may object to the introduction of evidence prior to trial by filing a motion in limine. A party need not make a formal objection at the time a trial court rules on the admissibility of the evidence, but need only make known the action he desires of the court and his grounds therefor. La.Code Civ. P. art. 1635. After ruling evidence inadmissible, the trial court shall permit the party seeking its introduction to proffer the evidence or make a statement as to the nature of the evidence. La Code Civ[.]P. art. 1636. The trial

court's rulings on the admissibility of evidence *are reviewable on appeal without the necessity of further formality*.

(Emphasis added)

Thus, we find merit in Sweet Lake's contention that the Motion in Limine was violated by Mr. Snell's above referenced testimony. We also note, in closing arguments, counsel for Oleum/AKSM implied the contamination remained on Sweet Lake's land, due at least in part, to Sweet Lake's refusal to "allow" Oleum/AKSM to perform any remediation work. During closing arguments counsel for Oleum commented "for us to go out there and do anything on the C-3 well, they have to give us permission to do so." Counsel for Oleum also suggested in closing they were eager to perform any remediation work, but implied they could not do so, stating "there may be some minor dirt work that needs to be done in that area, and we'd love to do it." We find this impermissible testimony and commentary by Oleum's witness and counsel likely affected the jury in the way Sweet Lake feared when filing its Motion in Limine, and as the judge feared whe the motion was granted.

Oleum also argued in brief that its obligation to restore the "surface area" around the C-3 well to Statewide Order 29-B requirements only pertained to the surface, and did not extend to any alleged underground contamination. We find Oleum's interpretation of surface to exclude anything past a few feet of depth is not supported by the generally prevailing meaning of that word in the mineral law. As Sweet Lake notes, Black's Law Dictionary defines "surface" in the context of mineral law to mean "[a]n entire portion of land, including mineral deposits, except those specifically reserved." Importantly, La.Civ.Code art. 490, which is titled "**Accession above and below the *surface***," provides that "the ownership of a tract of land carries with it the ownership of everything that is directly above or under it." The comments to that article also provide "ownership of the soil carries

with it everything that is directly above or under it unless otherwise provided by law." We also note in *Corbello v. Iowa Production*, 02-826 (La. 2/25/03), 850 So.2d 686, a large part of the substantial damages awarded to the plaintiffs pursuant to a *surface lease* was for the restoration of groundwater which threatened a nearby aquifer.

Oleum also argues restoration of the surface in the area surrounding the C-3 well site does not include the contamination which occurred when BP stored the brine or processed water into the pit on that site. We disagree. The 2003 amendment to the 1947 Lease specifically set forth that within six months of the cessation of activities, the lessee (Oleum) "shall plug and abandon the well and restore the surface area around the well to the requirements of Title 43, Statewide Order No. 29-B." As Sweet Lake notes there is nothing that makes that obligation contingent upon when the contamination occurred or who caused it. Therefore, restoration around the C-3 well site would include contamination caused by the brine or produced water from the nearby pit.

We agree with Sweet Lake that the lease in this case is the law as between the parties. The contract, i.e., the lease in this case, establishes the law between the parties. Louisiana Civil Code Article 2045 establishes the "[i]nterpretation of a contract is the determination of the common intent of the parties." The meaning and intent of the parties to a written instrument should be determined within the four corners of the document and its terms should not be explained or contradicted by extrinsic evidence. *Brown v. Drillers, Inc.*, 93-1019 (La.1/14/94), 630 So.2d 741. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation need be made into the parties' intent." La.Civ.Code art.2046. Moreover, "[p]arties are free to contract for any object that is lawful, possible, and determined or determinable." La.Civ.Code art 1971.

Accordingly, we find the lease between Sweet Lake and Oleum expressly provided "[w]ithin 6 months of determining that any well among the Nos. C-2, C-3, C-7, C-8, or C-9 Wells have no future utility, Lessee [Oleum] shall plug and abandon the well and restore the surface area around the well to the requirements of Title 43, Statewide Order No. 29-B." The record established that Oleum plugged the C-3 well on July 8, 2009. Thus, the lease, which is the law between the parties, required Oleum to perform its remediation obligations by January 8, 2010. Oleum did not do so, thus they were in breach of their obligation to restore under the lease. The jury erred in finding otherwise, and we hereby reverse that finding.

## II. *AKSM's Restoration Obligations Under the 2008 Lease.*

In this assignment of error, Sweet Lake contends the jury erred in finding AKSM did not breach its obligation to restore the area around the "Existing Oil Facility" under the 2008 Lease. In pertinent part, the 2008 Lease provided:

> LESSEE agrees to abandon the existing oil facility, located West of the Lands subject hereto and shown on Exhibit A, remove the tank and other equipment, *remove any contaminated soil and transport same for disposal* of same off of the lands of LESSOR and to conduct a site assessment of same as provided in Subparagraph 16(I) hereof and to provide a written copy of the site assessment to LESSOR by October 31, 2008 all at LESSEE's sole cost, risk and expense.

(Emphasis added.)

Thus, the 2008 Lease expressly required AKSM to abandon the Existing Oil Facility that was shown on Exhibit A, and to remove any contaminated soil from this area. Exhibit A depicts the Existing Oil Facility as a rectangular black box located on a map of the property. AKSM disputes whether the location of the Existing Oil Facility is determinable from Exhibit A. AKSM contends Exhibit A is ambiguous and should not be relied upon because it does not contain a legal description, is not to scale, and is not in color.

However, as Sweet Lake points out, it was AKSM's attorney who prepared Exhibit A. It is a well understood rule of construction that any ambiguity or contradiction which exists in the language of a contract must be construed against the party who prepared it. La.Civ.Code art. 2056; *Kenner Indus., Inc. v. Sewell Plastics, Inc.*, 451 So.2d 557 (La.1984); *Brafa v. Christ*, 05-270 (La.App. 3 Cir. 11/2/05), 915 So.2d 957.

We find the location of the Existing Oil Facility is determinable in the record. The record reveals the Existing Oil Facility encompassed an area approximately two acres in size. The north, east and south boundary lines were established by a barbed wire fence, and the west boundary line was delineated by a road that ran north and south. There was also a saltwater disposal well located at the south end of the facility. Thus, we find no ambiguity as to the location of the Existing Oil Facility in the 2008 Lease.

As set forth prior, the 2008 Lease expressly required AKSM to abandon the Existing Oil Facility and to remove any contaminated soil from that area. AKSM, through the testimony of Mike Snell, maintained it performed the clean-up it had agreed to do and hired an environmental company, ATC, to test the area and determine if it was clean. AKSM introduced a report from ATC made in 2010 which asserted there was no contamination in the first two feet of soil in the area of the Existing Oil Facility. Sweet Lake countered that the area where ATC tested was only a very small area to the far north of the Existing Oil Facility. The record establishes, with the exception of the ATC report, the testimony was conclusive that the area around the Existing Oil Facility was contaminated.

Testimony established the Existing Oil Facility was in an area located near the salt water disposal wells that had been used by BP and other operators to store hydrocarbons and processed water. Sweet Lake's experts found there was contamination present in the area around the Existing Oil Facility. Importantly, the

HET report, prepared by one of BP's remediation experts, found there was contamination in the area of the Existing Oil Facility. Although the estimated costs associated with remediating the area varied greatly between Sweet Lake's and BP's experts, they both were of the opinion that some level of contamination existed in the area around the Existing Oil Facility. Therefore, we find AKSM's reliance on the ATC report as evidence there was no contamination present in the area around the Existing Oil Facility was misplaced.

Accordingly, as AKSM had an express obligation under the 2008 Lease to "remove any contaminated soil and transport same for disposal of same off of the lands of [Sweet Lake]," and this was not done, we find AKSM was in breach of the 2008 Lease. The jury erred in its ruling to the contrary.

### III. Motions to Supplement the Record.

Before addressing the issue of damages, we must address the motions filed by each party as to the DNR proceedings held between BP and Sweet Lake. These motions were deferred to the merits.

Shortly after receiving Sweet Lake's reply brief, Oleum/AKSM filed a "Motion to Strike Evidence Related to DNR Hearing, or Alternatively, Motion for Leave to File Sur-Reply Brief and/or to Supplement the Record." In this motion, Oleum/AKSM noted that Sweet Lake referenced the DNR proceedings with BP wherein the DNR requested that BP provide more information "as to how its plan complied with 29-B requirements." BP sent a letter to DNR stating its plan complied with 29-B requirements as to both soil and groundwater, but it did provide supplemental plan information specifically addressing the soil and groundwater concern. In its reply brief, Sweet Lake attached an excerpt of the report of BP's remediation expert, HET, that it contended showed BP's plan did not meet 29-B requirements. Oleum/AKSM contended Sweet Lake ignored the portion of the HET report that claimed it was fully compliant with 29-B

requirements. They also maintained it was improper for Sweet Lake to expand the record before this court by attaching new evidence from the DNR proceeding.

Sweet Lake then filed an opposition to Oleum/AKSM's above motion, contending this court should "take judicial notice of the fact that DNR, the agency charged with regulating oilfield pollution, determined that BP's proposed plan at the trial of this matter did not comply with 29-B without exception and ordered BP to submit such a plan."

In response, Oleum/AKSM filed a "Motion to Take Judicial Notice, or Alternatively to Supplement the Record." In that motion, Oleum/AKSM maintained its position that taking judicial notice from the DNR proceedings is inappropriate, but if this court were to find it proper, it should also take judicial notice of the actual ruling by DNR, which was rendered on October 4, 2016. On the same day Oleum/AKSM filed the above "Motion to Take Judicial Notice, or Alternatively to Supplement the Record," Sweet Lake filed a "Motion to Supplement Record with October 4, 2016 DNR Ruling."

We will grant Sweet Lake's motion to take judicial notice of the DNR proceedings. Louisiana Code of Evidence article 201 governs judicial notice of adjudicative facts, defined as facts "normally determined by the trier of fact." A court shall take judicial notice upon request if supplied with the information necessary for the court to determine that there is no reasonable dispute as to the fact. La.Code Evid. art. 201(D). Louisiana Code of Evidence article 202 B(1)(b) provides that judicial notice may be taken of "[r]ules of . . . agencies of this state that have been duly published and promulgated in the Louisiana Register; or (e) Rules and decisions of boards, commissions, and agencies of . . . any state, . . . which have been duly published and promulgated and which have the effect of law within their respective jurisdictions." A party may also request judicial notice at any stage of the proceeding. La.Code Evid. art. 201(F).

As Sweet Lake notes, this court in *State v. Carpenter*, took judicial notice of information contained in a government website to prove a police chief received a "commission" within the meaning of a criminal statute. We also took judicial notice of a bank merger based on a Certificate of Merger found in the records of the Louisiana Office of Financial Institutions in *Premier Bank f/d/b/a Guaranty Bank v. Daigle*, 599 So.2d 503 (La.App. 3 Cir. 1992).

We find taking judicial notice of the DNR proceedings is appropriate in this case, as it was essentially a continuation of the proceedings between the same parties below, involving the same matter, and over the same property. We also grant both parties' motion to supplement the record to include the actual ruling of the DNR panel rendered on October 4, 2016.

## IV. *Damages.*

Having found merit in Sweet Lake's assignments of error that the jury erred in finding Oleum and AKSM did not breach their obligations under the respective leases, we must address the issue of damages. We note the jury, after hearing all the testimony of the various experts and reviewing the numerous expert reports, concluded it would cost "1.5 million dollars" to clean up all of Sweet Lake's contaminated property. This was essentially the amount BP proposed in its remediation plan. In contrast, Sweet Lake submitted several plans to the jury, which varied from a cost of $75 million to $11 million.

Having found no breach of the respective leases by Oleum and AKSM, the jury left blank the questions as to the amount of damages caused by their breaches. In its appellate brief, as it did prior in its presentation to the jury, Sweet Lake makes the following damage request as to Oleum's breach:

> Oleum did not present any evidence as to the cost of restoring the site even though it admitted that restoration was necessary. As the 2003 Lease Amendment explicitly requires cleanup to 29-B "requirements," the Court should find that Sweet Lake is entitled to an award of $4,176,100.

In the alternative, the Court should remand on the issue of damages. *State, Dep't of Transp. & Dev. v. Campbell*, 92-664 (La.App. 3 Cir. 4/14/93); 617 So.2d 1224, 1227-28.

As to AKSM's breach of its obligation to remove all contaminated soil at the site of the Existing Oil Facility, Sweet Lake set forth:

> Sweet Lake's expert, Perry Evans, testified that the cost to remove all of the contaminated soil was $4,100,000 (cost would be $90 per cubic yard). No defense witness testified regarding the cost to remove all of the contaminated soil in this area. As the 2008 Lease explicitly requires removal of all the contaminated soil, the Court should find that Sweet Lake is entitled to an award of $4,100,000.

It should be noted the two awards requested by Sweet Lake for these two areas would be in excess of $8 million dollars, which is more than five times the amount the jury determined it would take to clean up the entirety of Sweet Lake's contaminated property. Moreover, in its closing argument Sweet Lake asked that BP be found 95% liable for the damages to Sweet Lake's property, and that Oleum's and AKSM's liability combined be assessed at a combined 5%.

BP's remediation plan (and correspondingly Mr. Sagrera's testimony) is premised on restoring the land to a level that, although it is deemed satisfactory by BP, is less than what is required under Statewide Order 29-B. Specifically, BP can avoid 29-B requirements by relying on a RECAP exception to clean the property. Its obligation when employing this exception is far less stringent than that contractually undertaken by Oleum. As noted earlier, the 2003 Amendment to the 1947 Lease created an express obligation on Oleum's part that "[w]ithin 6 months of determining that any well among the Nos. C-2, C-3, C-7, C-8, or C-9 Wells have no future utility, Lessee [Oleum] shall plug and abandon the well and restore the surface area around the well *to the requirements of Title 43, Statewide Order No. 29-B*." (Emphasis added) Thus, Mr. Sagrera's costs are not necessarily reflective of restoring the property to the contractually agreed upon 29-B requirements. Moreover, Sweet Lake and BP differed completely on the need for

remediation of the shallow groundwater zone. BP advocated only a monitoring of groundwater was needed, while Sweet Lake proposed a pump and treat plan for groundwater. Compounding this problem, Oleum relied only on BP's remediation plans and did not present its own. Thus, Sweet Lake's plan is the only one that extrapolated the costs necessary to remediate the property fully to 29-B requirements. Still, this observation does not negate the fact that the parties arrived at different conclusions relating to what level of remediation would meet 29-B requirements.

The Sweet Lake remediation plan provided by Approach Environmental, and testified to by its president, Mark Moore, amounted to in excess of $75 million in costs. It proposed removing soil to a depth of 40 feet. Mr. Moore noted this proposal was based on 29-B requirements, which "establishes cleanup levels for soils, without a depth restriction." Mr. Moore acknowledged that the goal of 29-B cleanup is to address the intended use of the property. To that end, Sweet Lake also alternatively proposed a plan which excavated only the first four feet of soil, or what it referred to as the root depth. The cost of that plan was approximately $11 million.

Oleum and AKSM noted 29-b requirements are satisfied if the level of cleanup restores or renders the property fit for its "intended use." The record established the land at issue most likely will be used for rice farming, crawfishing, ranching and recreational hunting and fishing. There was also testimony that a residential subdivision development project was a possibility in the future. The DNR panel ruling concluded the Sweet Lake Soil Plan was *unreasonable in extent*, as it proposes removing soil up to 40 *feet* in depth. The depth needed to grow rice, soybeans, Bermuda grass was around 18 *inches*. The DNR panel determined it would structure a plan consistent with the BP plan; with the exception that DNR required further delineation of the contamination present, particularly in the areas

where the salt pits were located. As to groundwater, DNR determined neither the BP nor Sweet Lake groundwater plan provided conclusive evidence to establish the appropriate groundwater classification, which must be established to measure the impact to groundwater. Additional groundwater investigation was determined to be necessary, and BP was ordered to submit a comprehensive groundwater investigation and aquifer characterization work plan. DNR provided detailed instruction to BP to follow in submitting the requested plan. Essentially the DNR most feasible plan set out soil remediation costs of nearly $900,000.00, with the understanding that additional costs may be warranted. DNR was unable to project groundwater costs without the additional testing and information.

Oleum also notes Sweet Lake did not present any detailed evidence at trial as to the specific damage amount sought for the failure to remediate the area around the C-3 well site. Was the area the 0.79 acres talked about by Dr. Sagrera, or greater? It also seems clear that the $4.1 million figure requested by Sweet Lake would involve soil remediation to a depth of 40 feet, which the DNR report concluded was not necessary to remediate the property to satisfy the 29-B requirements. However, as noted by Sweet Lake, Oleum/AKSM presented no alternative cost figures for the clean-up of the area around the C-3 well site.

As to remediation of the area surrounding the Existing Oil Facility, the pertinent language in the 2008 Lease required AKSM to "remove any contaminated soil and transport same for disposal." Unlike the language in the 2003 Amendment to the 1947 Lease, this provision in the AKSM lease does not refer to the 29-B requirements. Moreover, the approximate $4 million estimate to remove soil to a depth of 40 feet from the area, is a plan of action the DNR found is unreasonable and unnecessary. However, as set forth above, Oleum/AKSM did not present alternative cost figures for the removal of the soil around the Existing Oil Facility.

It is a well-settled principle that only actual damages are allowable and these must be established with reasonable certainty, not by remote and conjectural estimates of loss. *Guillory v. Terra Intern., Inc.*, 613 So.2d 1084 (La.App. 3 Cir.), *writ denied*, 619 So.2d 1063 (La.1993); *Barnco Intern., Inc. v. Arkla, Inc.*, 28,157 (La.App. 2 Cir. 11/15/96), 684 So.2d 986, *writ denied*, 97-19 (La. 2/7/97), 688 So.2d 511. We find the record falls woefully short of establishing with any measure of reasonable certainty the amount of damages required to remediate the two areas at issue in this appeal.

As a consequence, we find it necessary to remand the case to obtain additional evidence. Our authority to remand an action to the trial court for consideration of an issue is derived from La.Code Civ.P. art. 2164 which states:

> The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. . . .

That article empowers an appellate court to remand a case for the consideration of new evidence. *State, Dep't of Transp. & Dev. v. Campbell*, 617 So.2d 1224 (La.App. 3 Cir. 1993); *Jones v. LeDay*, 373 So.2d 787 (La.App. 3 Cir. 1979).

In this case, the DNR panel, which was made up of DNR employees "with relevant technical backgrounds," accepted plans from both BP and Sweet Lake on the land at issue. They also had supplemental plans submitted and held a hearing with testimony from six different experts, as well as reviewing numerous exhibits. Despite this wealth of evidence, the DNR was unable to fully rule on how much it would cost to remediate the property. It "decided to structure a plan that is consistent in part with the BP plan, but also modified and/or requiring further evaluation where indicated."

Examining the record before us, we find on the issue of damages to these two specific areas we do not possess sufficient information to make a proper determination on quantum. Sweet Lake's requested amounts were based on a plan

of remediation that the DNR panel found was "unreasonable in extent." Oleum and AKSM did not present alternative figures, instead relying solely on BP's damages experts, who did not address the two areas at issue here with any specificity. Thus, we find the interests of justice compel that we remand this case back to the trial court solely for a determination as to the damages due.

## DECREE

For the foregoing reasons, the judgment of the lower court finding Oleum and AKSM did not breach their obligations under the respective leases is reversed. Finding the record was insufficient to allow this court to make a damage determination with any certainty, the matter is remanded solely for a hearing to determine the appropriate amount of damages due for the breach of the lease obligations. All costs of this appeal are assessed to defendants-appellees, Oleum Operating Company, L.C. and AKSM, L.C.

**REVERSED AND REMANDED.**

## ON REHEARING

**Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.**

**COOKS, Judge.**

Sweet Lake Land and Oil Company's application for rehearing is granted solely for clarification as to the portion of the opinion pertaining to the damages due Sweet Lake as a result of the respective breaches of the lease by Oleum Operating Company, L.C. and AKSM, L.C. On rehearing, we clarify that the costs and methods of the Act 312 regulatory cleanup involving Sweet Lake and BP does not serve as a limitation on the damages awardable to Sweet Lake for the breaches of the express restoration provisions contained in the leases involving Oleum and AKSM.

**REVERSED AND REMANDED.**